UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TANSEER KAZI, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>PNC BANK, N.A.,<br><br>    Defendant. | Case No. 18-cv-04810-JCS<br><br>**ORDER REGARDING MOTION FOR CLASS CERTIFICATION**<br><br>Re: Dkt. No. 73 |

## I. INTRODUCTION

Plaintiffs Tanseer Kazi and Linda Scheid bring this putative class action asserting wage and hour violations by Defendant PNC Bank, N.A. ("PNC"), and now move for class certification. The Court held a hearing on January 24, 2020. The parties now agree that Kazi cannot serve as a class representative due to his bankruptcy. Nevertheless, Plaintiffs' motion is GRANTED IN PART, as described below, with Scheid as class representative.[1] A case management conference will occur on March 13, 2020 at 2:00 PM, and the parties are instructed to file an updated joint case management statement no later than March 6, 2020 addressing a schedule for any motions or stipulations to modify the class definition.

## II. BACKGROUND

PNC Mortgage Loan Officers ("MLOs") received regular pay on a biweekly basis at all times relevant to this action. In addition to their regular pay, MLOs could also qualify for monthly

///

///

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

"Plan Incentive Pay,"[2] which consisted, in part, of commissions[3] earned on loan originations, but was also based on a number of other factors that together with the commissions resulted in "incentive credits" and thus incentive pay. The formula was generally governed by a plan document, one version of which was instituted in 2014 and another in 2017, as well as an "Addendum A" that was updated at least annually. Smiles Decl. ¶¶ 7–8 & Exs. 1–7. While the factors taken into account for incentive pay changed from time to time, the consistent practice was that "all incentive credits were added together each month and, if the credits exceeded the monthly threshold, an MLO received Plan Incentive Pay." *Id.* ¶ 15.

One factor that was consistent over the putative class period was that regular pay was effectively deducted from the other components of an MLO's Plan Incentive Pay.[4] *See, e.g.*, Smiles Decl. Ex. 3 at 6 ("Must exceed Regular Pay totals for the commission period in order to earn commissions. Deficits will be carried over to future commission periods."); *id.* at 7 (example calculation showing the value of two biweekly regular pay periods deducted from a monthly Plan Incentive Pay calculation under the label "Less Regular Pay Payment Recovery"). Although PNC formally paid its MLOs both their regular pay and any applicable Plan Incentive Pay, the fact that the value of regular and overtime pay was effectively deducted from otherwise-applicable Plan Incentive Pay meant that the total value actually received by an MLO was equivalent to the greater of: (1) the MLO's regular and overtime pay; *or* (2) the MLO's Plan Incentive Pay (before the deduction of regular and overtime pay was taken into account).

In some cases, when the Plan Incentive Pay formula resulted in a negative number—including as a result of deducting the value of regular pay—that deficit was carried over to the

---

[2] The term "Plan Incentive Pay" is used in PNC's briefs and declarations to refer to the monthly incentive pay at the core of Plaintiffs' claims, although it is not clear whether it is a term otherwise used within PNC. While PNC's incentive plan also governed quarterly and annual incentives, the term "Plan Incentive Pay" as used in this order refers only to monthly incentive pay.
[3] PNC does not itself use the term "commissions" in its briefs and appears to take issue with Plaintiffs' use of that term, but the term appears in some of its plan documents, *e.g.*, Smiles Decl. Ex. 3 at 9, and PNC does not dispute that a significant factor in the Plan Incentive Pay formula was based on the value of loans originated. *See* Opp'n at 6.
[4] PNC asserts that the value of regular pay and other effective deductions were "not subtracted from anything" but instead "assigned negative numbers" in the determination of Plan Incentive Pay. Opp'n at 6. Mathematically, of course, that is a distinction without a difference.

2

calculation of Plain Incentive Pay for the next month. *See, e.g.*, Smiles Decl. Ex. 3 (FAQ document including the question "My Regular Pay from May is being added to my deficit on my July CES; shouldn't it be forgiven every month?" and the answer "All deficits are carried over to future months when incentives/commissions do not exceed threshold."). Nevertheless, MLOs were never paid less than their regular pay for a given pay period, and failure to meet incentive goals would never result in them owing money to PNC at the end of their employment.

Of the 207 MLOs at issue here, PNC's senior compliance specialist Michael Smiles states that 41 never received Plan Incentive Pay. Smiles Decl. ¶ 15. Some MLOs also received annual incentive pay bonuses; "onboarding incentive pay," which was essentially a signing bonus upon taking a job with PNC, but often paid over time and contingent on the MLO staying with the company for a certain number of months; and/or other forms of compensation not specifically at issue in Plaintiffs' theory of their claims.

PNC's written policies encouraged employees to take a ten-minute on-the-clock rest break during every four-hour period of work or "major fraction thereof," such that when MLOs received their regular pay based on their hours worked, they would be paid for those rest periods. Plaintiffs contend, however, that PNC "recaptured" any pay for rest periods—as well as other nonproductive time like training sessions, staff meetings, and driving—by deducting regular pay from Plan Incentive Pay, and thus effectively paying *only* Plan Incentive Pay in months where MLOs qualified for it. *See* 2d Am. Compl. ("SAC," dkt. 44-1) ¶ 16. Based on the premise that Plan Incentive Pay is only attributable to the work done actually selling loans, Plaintiffs contend that MLOs who received Plan Incentive Pay were not paid for their rest periods or other nonproductive time. *See id.* ¶¶ 10, 16. Plaintiffs assert the following claims: (1) "fail[ure] to provide paid rest periods or pay premium wages in lieu thereof as required by California Labor Code § 226.7" and certain wage orders, including waiting time penalties for class members whose employment ended during the class period, *id.* ¶¶ 22–26; (2) failure to pay for non-productive time as required by the California Labor Code and applicable wage orders, again including waiting time penalties for non-current employees, *id.* ¶¶ 27–32; (3) violation of California laws requiring accurate wage statements, *id.* ¶¶ 33–36; (4) violation of California's Unfair Competition Law as a result of the

3

violations addressed in the previous claims, *id.* ¶¶ 37–41; and (5) a non-class, representative claim under California's Private Attorneys General Act, *id.* ¶¶ 42–47. Plaintiffs acknowledge in their complaint that they are limited to recovering damages for their first and second claims to the period beginning three years before filing this action, *id.* ¶¶ 25, 31, and that any recovery of statutory damages on the wage statement claim is limited to the period beginning one year before filing this action, *id.* ¶ 35. Plaintiffs' claims rely heavily, although not exclusively, on section 226.2 of the Labor Code, which provides that "employees who are compensated on a piece-rate basis for any work performed during a pay period" must "be compensated for rest and recovery periods and other nonproductive time separate from any piece-rate compensation." *See* Cal. Lab. Code § 226.2(a)(1).

At the time that Plaintiffs filed their operative complaint, they sought to represent a class defined as "all persons whom PNC employed in the State of California as a Mortgage Loan Officer at any time since four years before [June 28, 2018,[5]] the filing of this legal action until such time as there is a final disposition of this lawsuit." *Id.* ¶ 7. Based on a modification to PNC's policy in July of 2019, however, Plaintiffs might no longer seek certification "beyond the final paydate of the pre-July 2019 Compensation Plan," which would "include July and possibly August" of 2019 due to delays in the payment of Plan Incentive Pay. Mot. at 8.

## III. ANALYSIS

### A. Legal Standard

In the federal courts, class actions are governed by Rule 23 of the Federal Rules of Civil Procedure. A party seeking class certification must demonstrate that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Further, although not explicitly discussed in Rule 23, "an implied prerequisite to class certification is that the class must be sufficiently definite; the party seeking

---

[5] *See* Notice of Removal Ex. A (dkt. 1-2) (original complaint in state court).

4

certification must demonstrate that an identifiable and ascertainable class exists." *Xavier v. Philip Morris USA Inc.*, 787 F. Supp. 2d 1075, 1089 (N.D. Cal. 2011). In short, a party must show numerosity, commonality, typicality, adequacy, and ascertainability.

A proposed class must also satisfy at least one of the subsections of Rule 23(b). Plaintiffs in this action invoke Rule 23(b)(3), which provides that a class that meets the requirements of Rule 23(a) may be certified where "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348, 131 S. Ct. 2541 (2011) (internal quotation marks and citation omitted). "In order to justify a departure from that rule, a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Id*. "A party seeking class certification must affirmatively demonstrate his compliance with [Rule 23]—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.* at 350. "Rule 23 does not set forth a mere pleading standard." *Id.*

"Before certifying a class, the trial court must conduct a 'rigorous analysis' to determine whether the party seeking certification has met the prerequisites of Rule 23." *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012) (citation omitted). Such analysis, however, is not a "license to engage in free-ranging merits inquiries [regarding the ultimate outcome of the case] at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). Rather, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id*.

**B.  Numerosity and Ascertainability**

Plaintiffs satisfy the numerosity requirement if "the class is so large that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1); *see also Hanlon v. Chrysler Corp.*, 150 F.3d

1011, 1019 (9th Cir.1998). Although the requirement is not tied to any fixed numerical threshold, courts have routinely found the numerosity requirement satisfied when the class comprises 40 or more members. *See EEOC v. Kovacevich "5" Farms*, No. CV-F-06-165 OWW/TAG, 2007 WL 1174444, at *21 (E.D.Cal. Apr. 19, 2007).

Plaintiffs contend that more than 200 MLOs worked for PNC in California during the proposed class period, which is consistent with PNC compliance officer Smiles's declaration that the number was 207. *See* Mot. at 10; Smiles Decl. ¶ 12. If recovery on some or all claims is limited to the time since January 4, the release date effected by the class settlement in the earlier *Bland* case against PNC, addressed below in the context of predominance, 119 putative class members were employed during that period. *See* Mot. at 10 & n.5; Groh Decl. ¶ 4 & Ex. 2. PNC does not challenge Plaintiffs' showing of numerosity, nor is there any dispute that the class is ascertainable from PNC's payroll and employment records. The Court finds that the requirements of numerosity and ascertainability are satisfied.

## C. Commonality

The commonality requirement of Rule 23(a)(2) is met where "the class members' claims 'depend upon a common contention' such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each [claim] with one stroke.'" *Mazza*, 666 F.3d at 588 (internal citation omitted) (citing *Wal-Mart*, 131 S. Ct. at 2551). Thus, plaintiffs seeking to certify a class must "demonstrate 'the capacity of classwide proceedings to generate common answers' to common questions of law or fact that are 'apt to drive the resolution of the litigation.'" *Id.* (citing *Wal-Mart*, 131 S. Ct. at 2551). "The commonality preconditions of Rule 23(a)(2) are less rigorous than the companion [predominance] requirements of Rule 23(b)(3)." *Hanlon*, 150 F.3d at 1019. "[C]ommonality only requires a single significant question of law or fact." *Mazza*, 666 F.3d at 589 (citing *Wal-Mart*, 131 S. Ct. at 2556).

PNC argues that Plaintiffs have not established commonality because "there is no evidence establishing that salaries were uniformly offset or deducted." Opp'n at 15. PNC's senior compliance specialist and former mortgage incentive administration supervisor Michael Smiles states in his declaration, however, that the "value of the salary and straight-time portion of

6

1    overtime an MLO was paid in that pay period" was among the "amounts added together each
2    month to establish a threshold" that an MLO must meet to receive Plan Incentive Pay, and that
3    such regular pay is "assigned negative numbers"—or, to use mathematically equivalent language
4    to which PNC inexplicably objects, is subtracted from—any Plan Incentive Pay that the MLO
5    receives at least for that month. Smiles Decl. ¶ 13. MLOs always received at least the value of
6    their regular pay, and there appears to have been some variation in whether negative values from a
7    month where an MLO only received regular pay would be carried over to Plan Incentive Pay
8    calculations for a subsequent month. Nevertheless, the question of whether the application of this
9    formula at least *to months where MLOs received Plan Incentive Pay* adequately compensates for
10   rest breaks and other nonproductive time is common the class, and can be resolved with common
11   evidence—PNC's incentive plan documents, which varied in other ways over time but always
12   subtracted the value of regular pay for at least the month at issue from any Plan Incentive Pay to
13   be paid that month, and PNC's payroll records, which reflect whether MLOs received Plan
14   Incentive Pay.

15   PNC asserts that "whether [its] Plan involved 'commissions' or other incentives that were
16   'earned' by MLOs depends on a variety of factors and cannot be decided on a class basis,"
17   because "[t]he relevant Plan and Addendums for MLOs do not reference or provide for
18   commissions." Opp'n at 15. That assertion misrepresents the contents of the documents. *See,*
19   *e.g.*, Smiles Decl. Ex. 1 § 2.6 (defining a role for a "Commission Compensation Manager"
20   responsible for Plan Incentive Pay); *id.* Ex. 3 at 6 (listing "Monthly Commission Opportunity" as
21   one of the "Plan Features"); *id.* Ex. 3 at 8 ("The loan officer has $4,500 in Commissions . . . .");
22   *id.* Ex. 3 at 9 (discussing "commissions" throughout a "Commission Overtime Premium
23   Calculation Example"); *id.* Ex. 4 at 20 (referencing an MLO's "Commissions Earnings
24   Statement"); *id.* Ex. 5 at 17 (same); *id.* Ex. 6 at 17 (same); *see also id.* Ex. 7 (including much of
25   the same substantive content but replacing the word "commissions" with "incentives" or similar
26   terms). Even if, counterfactually, the plan documents did not use the word "commissions," the
27   fact would remain that MLOs' incentive compensation depended on loan originations and other
28   factors unrelated to taking rest breaks, and the regular pay that MLOs received for their rest breaks

7

was offset by subtracting it—or "assigning it a negative number"—in determining Plan Incentive Pay. Whether such a compensation structure satisfies California law is a common question to which a common answer can be determined. To be clear, the Court has no occasion on the present motion to consider what that answer should be; it is enough that whatever the answer is, it would be common to the class.

Next, PNC contends that the case does not present common issues because MLOs received other forms of compensation besides commissions (or commission-like incentives) and regular pay, both as components of Plan Incentive Pay and as other forms of incentive pay, and the combinations of incentives received varies between different MLOs. *See* Opp'n at 16–18. There is no apparent connection between any of those other forms of compensation and MLOs' rest breaks. Whether these other forms of compensation can satisfy PNC's obligation to pay employees for rest breaks and other nonproductive time is an issue common to the class. The potential need to consider the significance of multiple categories of pay—regular pay, Plan Incentive Pay, and other forms of incentive pay not specifically based on loan origination, with the latter category perhaps broken up into subcategories if the parties identify relevant distinctions among those other forms of compensation—does not preclude certification. Such analysis can be done on a classwide basis, and indeed much if not all of the same analysis would likely be necessary if any MLO who received multiple forms of incentive compensation brought an individual claim. PNC might or might not be correct that other forms of compensation can satisfy its obligations, but that is a merits question common to the class, not a reason to deny certification.

Finally, PNC argues that the potential application of two summary judgment cases not involving PNC but cited in Plaintiffs' motion—*Vaquero v. Stoneledge Furniture LLC*, 9 Cal. App. 5th 98 (2017) and *Barreras v. Wells Fargo Bank, N.A.*, No. CV 17-4344 PA (ASx), 2018 WL 5276294 (C.D. Cal. Jan. 19, 2018)—presents individualized issues. Opp'n at 17–18. PNC's arguments as to those cases, however, merely seek to distinguish them on their merits. PNC may well be correct that the cases are distinguishable, and Plaintiffs' claims might not be viable, but PNC has not meaningfully explained why applying those cases presents individualized issues

8

sufficient to undermine commonality.[6] It is not the Court's role at this stage to adjudicate the case on the merits. Whether *Vaquero* and *Barreras* are analogous to the case at hand, and whether this Court will choose to follow them, are issues common to the putative class.

Whether PNC's compensation structure satisfied PNC's obligation to pay for rest periods in months where MLOs received Plan Incentive Pay is an issue common to the putative class. Plaintiffs have satisfied this prong of Rule 23(a).

### D. Predominance and Superiority

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). Rule 23(b)(3) "is far more demanding" than the commonality test under Rule 23(a)(2). *Id.* at 624. That said, the Ninth Circuit has consistently "held that 'there is clear justification for handling the dispute on a representative rather than an individual basis' if 'common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication.'" *Mazza*, 666 F.3d at 589 (quoting *Hanlon*, 150 F.3d at 1022). Under Ninth Circuit law, complexity of individualized "damage calculations alone cannot defeat certification," *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir 2013), but where plaintiffs "ha[ve] not demonstrated that . . . damages [attributable to the plaintiffs' theory] *can* be measured on a classwide basis, the predominance requirement is not satisfied," *Doyle v. Chrysler Grp., LLC*, 663 F. App'x 576, 579 (9th Cir. 2016) (emphasis added) (nonprecedential). *See Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013) (reversing class certification where the plaintiffs failed to show "that damages are capable of measurement on a classwide basis"); *Leyva*, 716 F.3d at 513 (distinguishing *Comcast* and holding that a district court's denial of class certification on the basis that "highly individualized" damage calculations defeated predominance

---

[6] The only potentially individualized issue identified by PNC is that some MLOs, including Plaintiff Kazi, asserted they were paid a salary, while Plaintiff Scheid testified that she was not paid a salary. Opp'n at 17. The conflicting testimony plainly reflects differing *legal conclusions* as to the appropriate term for the MLOs' payments structure—neither Plaintiffs nor PNC assert that some MLOs were paid a salary while others were not, except perhaps with respect to the distinction between months where MLOs received only regular pay and months where they received Plan Incentive Pay, which is common to the class and presents at most an issue of calculating damages.

9

was a reversible error of law).

### 1. Claims Based on Statutory Rest Breaks

PNC asserts that Plaintiffs' deposition testimony that they were paid for nonproductive work evinces the need for individualized determinations as to that issue. Opp'n at 18–19. The testimony reflects only that Plaintiffs received their regular pay in months where they did not qualify for Plan Incentive Pay. *See id.* at 19. If Plaintiffs prevail on their theory that PNC's compensation scheme fails to compensate rest breaks and nonproductive time as required by California law, the question of whether particular class members had months where they received only regular pay, and in some cases had the "deficits" in their Plan Incentive Pay for those months forgiven rather than carried over to subsequent months, is a damages issue that can be resolved by reference to PNC's payroll documents and similar records. As a settled matter of Ninth Circuit precedent, the potential need to examine records for each employee individually to calculate damages does not defeat predominance. *Leyva*, 716 F.3d at 513; *see also Ridgeway v. Walmart Inc.*, 946 F.3d 1066, 1086 (9th Cir. 2020) ("Time and time again, this court has reaffirmed the principle that the need for individual damages calculations does not doom a class action.").

PNC also challenges, essentially, the concept of nonproductive time itself, arguing that determining whether particular tasks and time periods were in fact nonproductive will require individualized determinations. Opp'n at 19. PNC's suggestion that even rest breaks might be "productive" if "MLOs completely relax during breaks and thus perform more efficiently," *id.*, simply disregards Labor Code section 226.2's requirement that "rest and recovery periods" be compensated *separately* "from any piece-rate compensation." *See* Cal. Lab. Code § 226.2(a)(1). At least as to claims based on failure to compensate rest periods, the Court is not persuaded that differences in how MLOs might have benefited from those rest periods is relevant to the claims in any way, much less an individualized issue that defeats predominance.

PNC contends that two earlier class actions settlements—*Bland v. PNC Bank, N.A.*, No. 2:15-cv-01042-AJS (W.D. Pa.) (which also resolved the consolidated case *Gokhberg v. PNC Financial Services Group, Inc.*, No. 2:15-cv-01700-AJS (W.D. Pa.)), and *Batta v. PNC Bank N.A.*, No. MSC15-00728 (Cal. Super. Ct., Contra Costa)—defeat predominance as a result of their

releases and potential preclusive effects, and that two putative class members also released their potential claims as a result of settling earlier individual actions. Opp'n at 20. This is not a large number of earlier cases, and any effect that they might have on this action can be managed with subclasses if needed, or by modifying the class definition or class period at a later date if PNC succeeds in showing that the releases from those cases in fact bar any claim asserted here.[7]

PNC's opposition brief also includes, in the background section rather than argument, a conclusory footnote that "[i]n *Bland*, Plaintiffs' counsel made factual representations, including that MLOs were paid a **salary**, that the court accepted in its rulings," which PNC asserts would result in judicial estoppel as to some class members if this case proceeded as a class action. Opp'n at 14 n.5. Without citation to any such representations or rulings, however, the Court has no basis to resolve whether PNC's assertion is accurate, and disregards it as speculative and unsupported.

Plaintiffs have shown predominance with respect to their claims based on or derivative of PNC's alleged failure to separately pay for statutory rest periods. For much the same reasons, the Court also concludes that class treatment is superior to individual actions to resolve these claims. *Cf.* Opp'n at 24–25 (presenting arguments against superiority similar to those that PNC raised against predominance).

### 2. Other Nonproductive Time

The ways in which MLOs might have been productive during other forms of purportedly nonproductive time—such as meetings and training sessions—presents a closer call. PNC offers declarations from some MLOs indicating that they multitasked during meetings, communicating with customers and otherwise working on selling loans. Beagle Decl. ¶ 13; Lanteri Decl. ¶ 16.[8] Plaintiffs object to those declarations as from witnesses not disclosed under Rule 26, but even if

---

[7] Plaintiffs, apparently conceding that *Bland* bars their claims based on nonproductive work (but not rest periods), agree in their motion to limit the recovery period for non-rest-break nonproductive work claims to after the January 4, 2017 release date in *Bland*. Mot. at 10 & n.10 As discussed in the following section, however, the Court concludes that Plaintiffs have not shown predominance as to such claims for unrelated reasons, and declines to certify a class with respect to those claims at this time.

[8] Plaintiff Kazi's deposition testimony that he did "paperwork" during training sessions does not appear to be significant to this issue—PNC has not tied that "paperwork" to selling loans. It is equally possible that Kazi was referring to paperwork completed *as part of a training program.* *See* Rejali Decl. Ex. 2 (Kazi Dep.) at 167:12–15.

11

the Court did not consider those declarations, Plaintiffs have not suggested any manageable way to determine class members' nonproductive time other than statutory rest breaks. Unlike in *Leyva*, this is not merely an issue of consulting a "computerized payroll and time-keeping database," *cf.* 716 F.3d at 514, but instead would likely require individualized *testimony* as to whether MLOs could *remember* periods of time in which they were working but not selling loans. Even if PNC has records of training sessions that MLOs completed or meetings that they attended, Plaintiffs have not offered any classwide evidence from which to determine how long MLOs spent in those sessions or meetings, or whether they also worked on selling loans during that time.

The Court is not persuaded that plaintiffs seeking to represent a class must always provide a fully defined damages model at class certification. Two district court decisions cited by PNC that might be read as supporting that principle were decided in the brief interim between *Comcast* and *Leyva*, and their specific analysis might not be consistent with *Leyva*'s reaffirmation of the rule that individualized damages do not defeat certification. *See Forrand v. Fed. Exp. Corp.*, No. CV 08-1360 DSF (PJWx), 2013 WL 1793951, at *3 (C.D. Cal. Apr. 25, 2013); *Ginsburg v. Comcast Cable Commc'ns Mgmt. LLC*, No. C11-1959RAJ, 2013 WL 1661483, at *7 (W.D. Wash. Apr. 17, 2013). The issue here, however, is not that Plaintiffs have failed to present a specific model that calculates all class members' damages, but instead that they have not shown even a common source of evidence to determine how much nonproductive working time, if any, MLOs engaged in during the proposed class period. *See, e.g.*, *Green v. Fed. Exp. Corp.*, 614 F. App'x 905 (9th Cir. 2015) (nonprecedential) (affirming *Forrand* and holding that the district court did not abuse its discretion denying class certification where the plaintiff failed to identify any evidence, beyond testimony from employees at one particular branch, from which to determine whether employees were under the defendant's control during "grace periods" between clocking in and starting their shifts).

Plaintiffs argue that they can use representative samples and statistical evidence in lieu of actual evidence of how class members used their time. Reply at 12 n.21. In the Supreme Court cases on which Plaintiffs rely, the Court held that sample evidence could be used to determine time typically spent on repetitive tasks like walking to a workstation (which is no longer

12

compensable, but was at the time) or donning and doffing protective equipment, holding that such evidence is permissible in a class action if it would be permissible to prove an individual plaintiff's claim. *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045–47 (2016) (discussing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 685 (1946) (superseded by statute on other grounds)). The samples in those cases, which, unlike here, the plaintiffs actually obtained and put in the record, showed limited variation in the time that employees spent on those tasks. The issues here—how long employees spent in training sessions, for example, or whether they multitasked and performed sales work during those sessions—are likely not amenable to such uniform proof, and Plaintiffs have made no showing that representative evidence would be reliable. This case is also distinguishable from Judge Freeman's decision in *Kang v. Wells Fargo Bank, N.A.*, where the defendant's own person-most-knowledgeable under Rule 30(b)(6) testified to the amount of time that employees typically spent on specific categories of nonproductive time. *See Kang v. Wells Fargo Bank, N.A.*, No. 17-cv-06220-BLF, 2019 WL 468818, at *3 (Feb. 6, 2019), *modified on other grounds by stipulation*, 2019 WL 944523 (N.D. Cal. Feb. 27, 2019). The Court does not rule out the possibility that Plaintiffs might be able to overcome this issue with surveys and statistical expert testimony, but it is Plaintiffs' burden to show that class treatment is appropriate, and they have offered no evidence thus far to indicate that nonproductive time other than rest breaks can be proved on a classwide basis. Mere speculation that samples and statistics *might* serve that purpose is not sufficient. *See Ridgeway*, 946 F.3d at 1086–87 (noting that "plaintiffs do not have free rein in using [representative] evidence," that courts "must decide whether representative evidence [is] properly used in [a particular] case," and that "representative evidence and statistical evidence are not always proper" but rather "only permissible when 'the evidence is reliable in proving or disproving the elements of the relevant cause of action'" (quoting *Tyson Foods*, 136 S. Ct. at 1046)).

As far as the Court can discern from the record presented on this motion, pursuing claims based on nonproductive working time would require virtually a full trial for each MLO as to when and how they worked, what records they or PNC might have retained, whether the MLO remembers how long they spent in meetings and training sessions, and whether they recall

13

1    working on selling loans during that time. It is conceivable that representative or statistical

2    evidence might provide an alternative method of proof, but Plaintiffs have not yet shown that to be

3    true in this case. Under these circumstances, the Court concludes that individualized issues

4    predominate as to claims based on nonproductive time other than rest periods, and DENIES

5    certification as to those claims, without prejudice to Plaintiffs later moving to expand the class

6    definition if they can show some classwide method of proof.

### E. Typicality

In assessing typicality, under Rule 23(a)(3), courts consider "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir.1992); *see also Wal-Mart*, 564 U.S. at 348–49 ("[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members."). The typicality and commonality requirements "tend to merge" because "[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Wal-Mart*, 564 U.S. at 349 n.5 (2011) (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157−58 n.13 (1982)).

PNC argues that Kazi is atypical because—among other reasons—he filed for bankruptcy while this case was pending, failed to disclose that bankruptcy in this case, and failed to disclose this claim in his bankruptcy, and as a result the bankruptcy trustee has asserted ownership of Kazi's claim. Plaintiffs agree that Kazi is no longer qualified to serve as a class representative. Reply at 1.

The question, then, is whether Scheid satisfies this requirement as the only remaining class representative. PNC argues that she is not because some of her testimony differs from other MLOs' understandings of their employment or might tend to undermine Plaintiffs' claims, but most of the discrepancies that PNC cites—e.g., whether MLOs received a salary or hourly wage and whether they were compensated for all time worked—reflect legal conclusions rather than

14

factual differences. *See* Opp'n at 21. Discrepancies between Scheid's testimony and Kazi's testimony, moreover, do not show that Scheid is atypical of the class as a whole, because there is no way to tell whether the atypical individual is Scheid rather than Kazi, whom Plaintiffs now concede is atypical based on his bankruptcy. PNC also argues that Scheid is atypical because she was a member of the class in the earlier *Bland* case, Opp'n at 22, but as Plaintiffs contend in their reply, Scheid's status as having worked for PNC both before and after the date of the releases in *Bland* means that some of the recovery she seeks could be affected by that release, while other portions of her potential recovery would not be, Reply at 9–11. The Court agrees that Scheid's interest in both pre- and post-*Bland* claims supports, rather than detracts from, her typicality as a class representative.

Scheid satisfies the typicality requirement of Rule 23(a).

**F. Adequacy**

Rule 23(a)(4), which requires that the class representatives "fairly and adequately protect the interests of the class," is satisfied if the proposed representative plaintiffs do not have conflicts of interest with the proposed class and are represented by qualified and competent counsel. *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 535 (N.D. Cal. 2012).

PNC challenges the adequacy of Kazi, Schied, and Plaintiffs' counsel. Opp'n at 22–24. The Court need not address Kazi's adequacy, as Plaintiffs now concede that he cannot serve as a class representative.

With respect to Scheid, PNC argues only that she "demonstrated a similar lack of engagement" to Kazi, citing three pages of Scheid's deposition. Opp'n at 23. Scheid testified in those pages that she spoke to her attorneys "initially" (perhaps meaning at the outset of the case), before her deposition, when she prepared a deposition, and when she answered interrogatories, as well as an instance when she found documents from her time at PNC and sent those to her attorneys. Rejali Decl. Ex. 1 (Scheid Dep.) at 49:15–52:10. Scheid states in her declaration that she reached out to her attorneys on her own initiative to discuss employment issues before this case was filed, that she has spent significant amounts of time discussing the case with her counsel and believes she has "had a basic grasp of the claims in this lawsuit" throughout its prosecution,

15

and that she located and watched a video of Ninth Circuit arguments in a different employment case against Wells Fargo on her own initiative. *See generally* Scheid Decl. (dkt. 81-5). The Court is satisfied that Scheid meets the "low" "threshold of knowledge required to qualify a class representative." *See Californians for Disability Rights, Inc. v. Cal. Dep't of Transp.*, 249 F.R.D. 334, 349 (N.D. Cal. 2008) (citation and internal quotation marks omitted).

As for Plaintiffs' counsel, the Court has concerns about the apparent lack of engagement between counsel and Kazi. If Kazi's statement to the bankruptcy trustee are believed, counsel did not speak to him for many months after the complaint was filed, including when counsel filed an alternative dispute resolution certification on his behalf, and Kazi did not know what the claims in this case were at the time he spoke to the trustee. *See* Rejari Decl. Ex. 5 (transcript of creditor's hearing). Counsel's apparent lack of knowledge of Kazi's bankruptcy until after the present motion for class certification was filed also suggests a lack of engagement and communication with their client. Nevertheless, the Court recognizes that such arguments by PNC are difficult for Plaintiffs' counsel to rebut without implicating issues of privilege, and that counsel has an extensive history of prosecuting successful class actions and, by all accounts, has engaged with Scheid throughout this case.

Despite the concerns raised with respect to Kazi, the Court finds that counsel is adequate, and that Rule 23(a)(4) is satisfied. Plaintiffs' attorneys are appointed as class counsel.

**IV. CONCLUSION**

For the reasons discussed above, Plaintiffs' motion for class certification is GRANTED in part and DENIED in part. Plaintiff Scheid may represent a class of PNC mortgage loan officers for claims based on alleged failure to pay for rest breaks, and claims derivative of such a theory, defined as all individuals who were employed by PNC as mortgage loan officers at any time from June 28, 2014 through the resolution of this action.

Plaintiffs indicated they may wish to modify the class time period to account for a policy change that PNC instituted in July of 2019, but that they do not yet have sufficient information to determine whether that change affects their claims. The parties are instructed to meet and confer regarding a schedule for any motions or stipulations to modify the class definition, either to set an

earlier end date or to seek to include claims based on nonproductive time other than rest breaks. A case management conference will occur on March 13, 2020 at 2:00 PM. The parties shall file an updated joint case management statement no later than March 6, 2020.

**IT IS SO ORDERED.**

Dated: February 7, 2020

_____
JOSEPH C. SPERO
Chief Magistrate Judge