1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TANSEER KAZI, et al.,

Plaintiffs,

v.

PNC BANK, N.A.,

Defendant.

Case No.  18-cv-04810-JCS

**ORDER REGARDING MOTIONS TO MODIFY CLASS CERTIFICATION**

Re: Dkt. Nos. 117, 118

## I.     INTRODUCTION

The Court previously granted in part a motion to certify a class of current or former mortgage loan officers ("MLOs") represented by Plaintiff Linda Scheid[1] asserting claims based on the purported failure of Defendant PNC Bank, N.A. ("PNC") to compensate rest breaks as required by California law.  At the Court's invitation, each party now moves to modify the certified class: PNC seeks to limit the class to MLOs employed through June 30, 2019 because PNC changed its compensation plan at that time and instituted an arbitration agreement for MLOs hired after that date, and Scheid seeks to expand the claims covered by the class definition to include failure to compensate training sessions in addition to rest breaks.  The Court held a hearing by public videoconference on June 19, 2020.  For the reasons discussed below, PNC's motion is GRANTED, and Scheid's motion is DENIED.[2]

---

[1] Tanseer Kazi is also named as a plaintiff in this case, but the Court determined that he cannot serve as a class representative due to his bankruptcy, and neither Kazi nor his bankruptcy trustee have participated in the case since that determination.
[2] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

## II.     BACKGROUND

### A.     Claims and Factual Background

During the period of time at issue, PNC provided incentive compensation for its MLOs using a formula based in large part on the MLOs' loan sales.  While PNC also provided a basic level of pay purportedly independent of incentive compensation, that basic pay was effectively deducted from any incentive pay, such that in a given month an MLO would receive *either* the incentives they earned *or* their base pay, whichever was larger.  In at least some circumstances, a negative balance on the calculation of incentive pay (after effectively deducting base pay) would carry over to future months.  Nevertheless, MLOs were never paid less than their regular pay for a given pay period, and failure to meet incentive goals would never result in them owing money to PNC at the end of their employment.  MLOs also received other forms of incentive pay besides the monthly incentives calculated from loan sales, but those other forms of compensation are not at issue in this case.

Scheid contends that by effectively paying *only* incentive pay in months where MLOs qualified for it, PNC "recaptured" any pay for "nonproductive" time not spent selling loans, such as rest periods and training sessions, and thus failed to pay MLOs for that time.  Scheid asserts the following claims: (1) "fail[ure] to provide paid rest periods or pay premium wages in lieu thereof as required by California Labor Code § 226.7" and certain wage orders, including waiting time penalties for class members whose employment ended during the class period, 2d Am. Compl. (dkt. 44-1) ¶¶ 22–26; (2) failure to pay for non-productive time as required by the California Labor Code and applicable wage orders, again including waiting time penalties for non-current employees, *id.* ¶¶ 27–32; (3) violation of California laws requiring accurate wage statements, *id.* ¶¶ 33–36; (4) violation of California's Unfair Competition Law as a result of the violations addressed in the previous claims, *id.* ¶¶ 37–41; and (5) a non-class, representative claim under California's Private Attorneys General Act, *id.* ¶¶ 42–47.  Scheid's claims rely heavily, although not exclusively, on section 226.2 of the Labor Code, which provides that "employees who are compensated on a piece-rate basis for any work performed during a pay period" must "be compensated for rest and recovery periods and other nonproductive time separate from any piece-

United States District Court
Northern District of California

1  rate compensation." *See* Cal. Lab. Code § 226.2(a)(1).

2  **B.    Previous Order**

3      The Court previously granted in part Plaintiffs' motion to certify this case as a class action

4  under Rule 23 of the Federal Rules of Civil Procedure.  *See generally* Order re Mot. for Class

5  Certification ("1st Class Cert. Order," dkt. 96).[3]  The Court held that with at least 119 members

6  and potentially more than 200, the class satisfied the requirements of numerosity and

7  ascertainability, which PNC did not dispute, *id.* at 5–6, and that "the question of whether the

8  application of [PNC's] formula at least to months where MLOs received Plan Incentive Pay

9  adequately compensates for rest breaks and other nonproductive time" satisfied Rule 23(a)(2)'s

10  commonality requirement, *id.* at 6–9.  The Court concluded that although Plaintiff Tanseer Kazi

11  could not serve as a class representatives due to his bankruptcy, Plaintiff Linda Scheid met Rule

12  23's requirements of typicality and adequacy, and class counsel was also adequate for the purpose

13  of that rule.  *Id.* at 14–15.

14      The more difficult question was whether, for the purpose of Rule 23(b)(3), common issues

15  predominated and a class action would be a superior method of adjudication.  The Court held that

16  common issues predominated as to claims based on rest breaks, but that Plaintiffs had not met

17  their burden to show predominance with respect to other forms of nonproductive time—including

18  meetings and training sessions—because they had not shown any classwide method to prove the

19  amount of time that MLOs spent in meetings and training sessions *not* multitasking and also

20  selling loans.  *Id.* at 9–14.

21      The Court therefore granted the motion in part and authorized Scheid to "represent a class

22  of PNC mortgage loan officers for claims based on alleged failure to pay for rest breaks, and

23  claims derivative of such a theory, defined as all individuals who were employed by PNC as

24  mortgage loan officers at any time from June 28, 2014 through the resolution of this action."  *Id.* at

25  16.  That order was without prejudice to Plaintiffs bringing another motion to certify claims based

26

27  [3] *Kazi v. PNC Bank, N.A.*, No. 18-cv-04810-JCS, 2020 WL 607065 (N.D. Cal. Feb. 7, 2020).
28  Citations herein to the Court's previous order refer to page numbers of the version filed in the
   Court's ECF docket.

United States District Court
Northern District of California

1   on other forms of nonproductive time, *id.* at 14, and to the parties filing a stipulation or motion "to

2   modify the class time period to account for a policy change that PNC instituted in July of 2019,"

3   *id.* at 16.

4       **C.**   **Arguments**

5           **1.**   **PNC's Motion**

6         PNC moves to replace the words "through the resolution of this action" with "through June

7   30, 2019" as the end date of the class definition, and to exclude individuals who are required to

8   arbitrate their claims.  *See generally* PNC Mot. (dkt. 117).  PNC asserts that it altered its policies

9   as of July 1, 2019 to no longer consider MLOs' basic pay in determining their incentive

10  compensation, and that it began requiring MLOs hired after that date to enter arbitration

11  agreements.  *Id.* at 1–2.

12        Scheid does not oppose modifying the end date, but argues that the class definition should

13  not include language addressing arbitration agreements, because PNC only began using arbitration

14  agreements for MLOs after the June 30, 2019 class period end date and a reference to such

15  agreements in the class definition might confuse class members.  Pl.'s Response (dkt. 124) at 1.

16  Scheid asserts that she agreed to the end date before PNC filed its motion.  *Id.*  Scheid also argues

17  that the class claims should not be limited to "an alleged failure to pay for rest breaks" because the

18  class seeks statutory penalties for failure to provide paid rest breaks rather than back pay for those

19  breaks, and because (as addressed in her own motion) she believes claims based on training

20  sessions should also be certified.  *Id.* at 1 n.1.

21        PNC filed a lengthy reply brief disputing Scheid's contention that she had agreed to an end

22  date before PNC filed its motion, PNC Reply (dkt. 126) at 2–4, and arguing that in order to

23  "allow[] for effective review of certification decisions," the Court should expressly find that the

24  arbitration agreements PNC began using on July 1, 2019 are a basis for the now-undisputed June

25  30, 2019 end date, *id.* at 4–7.  Nevertheless, "PNC does not object to a class definition that does

26  not include a reference to the arbitration agreements so long as the class notice (which must yet be

27  negotiated) clearly indicates that California MLOs who started work after June 30, 2019, are not

28  part of the Class because the July 2019 Plan does not give rise to claims in the case and any such

1   employees would be subject to and barred by individual arbitration agreements." *Id.* at 6.  PNC

2   also argues that in identifying the claims based on rest breaks, the Court should use language

3   similar to its previous class certification order—"claims based on alleged failure to pay for rest

4   breaks, and claims derivative of such a theory," 1st Class Cert. Order at 16—to avoid implying

5   that PNC prevented MLOs from taking rest breaks, which Scheid has not asserted.  Reply at 7–8.

6   　　　　　　　　　**2.**　　　**Scheid's Motion**

7   　　　　Scheid moves to expand the scope of class certification to encompass claims based on

8   failure to pay for training sessions.  *See generally* Pl.'s Mot. (dkts. 118, 119).[4]  To avoid

9   preclusive effect of a previous class settlement, *Bland v. PNC Bank*, Scheid seeks certification of

10  claims based on training only for the period beginning after the January 5, 2017 effective date of

11  that settlement.  *Id.* at 3.

12  　　　　Scheid contends that such claims, as opposed to claims also encompassing meetings and

13  other nonproductive time, are narrowly tailored to avoid the concerns raised in the Court's

14  previous order, and that PNC maintained records of the estimated duration for each of its training

15  sessions and what training sessions each employee completed, as well as the training materials

16  themselves.  *See id.* at 3–9.  In Scheid's view, testimony from PNC's representative that the

17  "durations" were intended as maximum rather than typical times for completion do not detract

18  from their relevance.  *Id.* at 6.  She argues that reasonable estimates of the length of the training

19  sessions are sufficient to warrant certification where PNC has failed to keep more accurate records

20  of how long each MLO spent on nonproductive time.  *Id.* at 10–11.  Scheid also contends that

21  MLOs could not have performed sales functions while completing the trainings because they

22  needed to pay close attention to the trainings in order to complete tests before they could receive

23  credit for them.  *Id.* at 11–13.

24  　　　　PNC argues that Scheid has not offered evidence to show how long any MLO other than

25  Scheid herself spent on training sessions, and PNC does not have such evidence.  PNC Opp'n (dkt.

26

27  ───────────────

    [4] Scheid filed her notice of motion as docket entry 118 and her memorandum of points and
28  authorities as docket entry 119.  Citations herein to particular pages of her motion refer to the
    latter.

United States District Court
Northern District of California

United States District Court
Northern District of California

125) at 4–9, 12–15.  According to PNC, the absence of such evidence negates any potential for "common answers," as required for class certification.  *Id.* at 9–10 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 US. 338, 350 (2011)).  PNC also argues that Scheid has not shown that PNC had any obligation to track MLOs' training time.  *Id.* at 11.  PNC contends that Scheid cannot account for MLOs multitasking with sales work while they completed training, and that Scheid's personal experience is not representative of other MLOs.  *Id.* at 15–18.  PNC concludes that class treatment of claims based on training would be unmanageable and inefficient, and individual issues would predominate.  *Id.* at 18–19.

Scheid argues in her reply that PNC was required to maintain records of nonproductive time under the California Labor Code and that, under the relaxed standard of proof where an employer fails to do so, its "duration" figures suffice as estimates and any deviations from that "estimate of the norm" do not warrant denying certification.  Pl.'s Reply (dkt. 130) at 1–5.  Scheid questions PNC's purported evidence of employees multitasking during trainings, and again argues that testing required during the trainings suggest that such multitasking is implausible or, if it occurred, would have extended the time an employee needed to complete the training such that the total nonproductive time would remain the same.  *Id.* at 5–6.  Scheid also disputes PNC's evidence that the "durations" were intended as maximums rather than estimates of typical time, arguing that PNC failed to offer testimony from the person who calculated them, and contends that some of PNC's representative's deposition testimony suggests that PNC could in fact distinguish whether employees completed training or tested out of it.  *Id.* at 6, 8–9.  Alternatively, Scheid suggests that she could show damages through testimony of other class members or by offering the training materials themselves for the jury to evaluate.  *Id.* at 7–8 & n.8.  According to Scheid, this case meets the standard that the Supreme Court has set forth for damages issues in employment cases where an employer failed to retain records, and falls within the Ninth Circuit's rule that individual damages calculations alone may not defeat class certification.  *Id.* at 9–10.

Scheid also suggests, but declines to address in detail, that defense counsel violated rules of professional conduct by gratuitously insulting Scheid's intelligence in PNC's opposition brief.  *Id.* at 1 n.1.

III.     ANALYSIS

A.     Legal Standard

In the federal courts, class actions are governed by Rule 23 of the Federal Rules of Civil Procedure.  A party seeking class certification must demonstrate that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).  Further, although not explicitly discussed in Rule 23, "an implied prerequisite to class certification is that the class must be sufficiently definite; the party seeking certification must demonstrate that an identifiable and ascertainable class exists."  *Xavier v. Philip Morris USA Inc.*, 787 F. Supp. 2d 1075, 1089 (N.D. Cal. 2011).  In short, a party must show numerosity, commonality, typicality, adequacy, and ascertainability.

A proposed class must also satisfy at least one of the subsections of Rule 23(b).  Here, Scheid invokes Rule 23(b)(3), which provides that a class that meets the requirements of Rule 23(a) may be certified where "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (internal quotation marks and citation omitted).  "In order to justify a departure from that rule, a class representative must be part of the class and possess the same interest and suffer the same injury as the class members."  *Id.*  "A party seeking class certification must affirmatively demonstrate his compliance with [Rule 23]—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc."  *Id.* at 350.  "Rule 23 does not set forth a mere pleading standard."  *Id.*

"Before certifying a class, the trial court must conduct a 'rigorous analysis' to determine whether the party seeking certification has met the prerequisites of Rule 23."  *Mazza v. Am. Honda*

United States District Court
Northern District of California

1    *Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012) (citation omitted).  Such analysis, however, is

2    not a "license to engage in free-ranging merits inquiries [regarding the ultimate outcome of the

3    case] at the certification stage."  *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466

4    (2013).  Rather, "[m]erits questions may be considered to the extent—but only to the extent—that

5    they are relevant to determining whether the Rule 23 prerequisites for class certification are

6    satisfied."  *Id.*

7         Rule 23 "provides district courts with broad discretion to determine whether a class should

8    be certified, and to revisit that certification throughout the legal proceedings before the court,"

9    including discretion, "[w]here appropriate," to "redefine the class."  *Armstrong v. Davis*, 275 F.3d

10   849, 872 n.28 (9th Cir. 2001), *abrogated on other grounds as recognized by B.K. ex rel. Tinsley v.*

11   *Snyder*, 922 F.3d 957, 974 (9th Cir. 2019).

12        **B.    PNC's Motion**

13        There is no real dispute on any issue raised in PNC's motion.  The parties agree that the

14   class should be defined as encompassing claims only through June 30, 2019.  The Court is

15   satisfied that the materially different compensation plan instituted after that date renders any

16   challenge to that plan sufficiently distinct from the claims raised here to defeat predominance, and

17   that Scheid (who no longer worked for PNC at that time) would not be typical of MLOs raising

18   such a challenge.  The Court is also satisfied that Scheid, who did not sign an arbitration

19   agreement, is not typical of MLOs hired after June 30, 2019, who were required to sign arbitration

20   agreements.  To be clear, the Court has no occasion on the present motions to consider whether

21   PNC's compensation policies either before or after June 30, 2019 complied with California law, or

22   whether the arbitration agreements signed by MLOs hired after that date are enforceable.  It is

23   enough that those questions present material differences between the claims at issue here and any

24   claim that some other plaintiff might raise challenging PNC's post-June 30, 2019 compensation.

25   PNC's motion to establish a June 30, 2019 end date is GRANTED.

26        The Court does not reach at this time any argument as to whether notice to the class must

27   include an explanation of why the class period ends on that date.  The Court also declines to

28   resolve which party bears greater blame for these essentially undisputed issues being raised in a

United States District Court
Northern District of California

United States District Court
Northern District of California

1   fully briefed motion.  Based on the procedural history described in the parties' briefs, it appears

2   likely that *either* party could have avoided such an outcome by more vigorously pursuing

3   negotiations towards a stipulation, even in the face of some degree of intransigence or neglect by

4   the opposing party, but that question is not relevant to the outcome of the motion.

5        As for the class definition of rest break claims, Scheid's non-opposition to PNC's motion

6   is not an appropriate vehicle for seeking reconsideration of the definition stated in the previous

7   order.  Regardless, the Court remains satisfied that a definition including "claims based on alleged

8   failure to pay for rest breaks, and claims derivative of such a theory" encompasses the theory that

9   the class is entitled to statutory damages based on PNC's purported "recapture" of pay for rest

10  breaks.

11      **C.    Scheid's Motion**

12       The Court previously limited class certification to claims based on statutory rest periods,

13  holding that Plaintiffs had not shown common issues to predominate with respect to other

14  categories of "nonproductive" working time.  Scheid now seeks to expand the scope of

15  certification to include claims based on time spent completing training sessions.

16                **1.    Previous Order on Nonproductive Time**

17       Addressing Plaintiffs' claims based on nonproductive time other than rest breaks in the

18  previous class certification order, the Court held:

19            Unlike in *Leyva*, this is not merely an issue of consulting a

20  "computerized payroll and time-keeping database," *cf.* 716 F.3d at
    514, but instead would likely require individualized *testimony* as to

21  whether MLOs could *remember* periods of time in which they were
    working but not selling loans. Even if PNC has records of training

22  sessions that MLOs completed or meetings that they attended,
    Plaintiffs have not offered any classwide evidence from which to

23  determine how long MLOs spent in those sessions or meetings, or
    whether they also worked on selling loans during that time.

24  Class Cert. Order at 12.

25       The Court held that although a plaintiff need not "always provide a fully defined damages

26  model at class certification," Plaintiffs' failure to show "even a common source of evidence to

27  determine how much nonproductive working time, if any, MLOs engaged in during the proposed

28  class period" compelled a decision not to certify those claims.  *Id.*  The Court addressed Plaintiffs'

1  arguments on this subject as follows:

2          Plaintiffs argue that they can use representative samples and statistical
3          evidence in lieu of actual evidence of how class members used their
           time. Reply at 12 n.21. In the Supreme Court cases on which Plaintiffs
4          rely, the Court held that sample evidence could be used to determine
           time typically spent on repetitive tasks like walking to a workstation
5          (which is no longer compensable, but was at the time) or donning and
           doffing protective equipment, holding that such evidence is
6          permissible in a class action if it would be permissible to prove an
           individual plaintiff's claim. *See Tyson Foods, Inc. v. Bouaphakeo*,
7          136 S. Ct. 1036, 1045–47 (2016) (discussing *Anderson v. Mt.
           Clemens Pottery Co.*, 328 U.S. 680, 685 (1946) (superseded by statute
8          on other grounds)). The samples in those cases, which, unlike here,
           the plaintiffs actually obtained and put in the record, showed limited
9          variation in the time that employees spent on those tasks. The issues
           here—how long employees spent in training sessions, for example, or
10         whether they multitasked and performed sales work during those
           sessions—are likely not amenable to such uniform proof, and
11         Plaintiffs have made no showing that representative evidence would
           be reliable. This case is also distinguishable from Judge Freeman's
12         decision in *Kang v. Wells Fargo Bank, N.A.*, where the defendant's
           own person-most-knowledgeable under Rule 30(b)(6) testified to the
13         amount of time that employees typically spent on specific categories
           of nonproductive time. *See Kang v. Wells Fargo Bank, N.A.*, No. 17-
14         cv-06220-BLF, 2019 WL 468818, at *3 (Feb. 6, 2019), *modified on
           other grounds by stipulation*, 2019 WL 944523 (N.D. Cal. Feb. 27,
15         2019). The Court does not rule out the possibility that Plaintiffs might
           be able to overcome this issue with surveys and statistical expert
16         testimony, but it is Plaintiffs' burden to show that class treatment is
           appropriate, and they have offered no evidence thus far to indicate
17         that nonproductive time other than rest breaks can be proved on a
           classwide basis. Mere speculation that samples and statistics *might*
18         serve that purpose is not sufficient. *See Ridgeway* [*v. Walmart Inc.*,
           946 F.3d 1066, 1086–87 (9th Cir. 2020)] (noting that "plaintiffs do
19         not have free rein in using [representative] evidence," that courts
           "must decide whether representative evidence [is] properly used in [a
20         particular] case," and that "representative evidence and statistical
           evidence are not always proper" but rather "only permissible when
21         'the evidence is reliable in proving or disproving the elements of the
           relevant cause of action'" (quoting *Tyson Foods*, 136 S. Ct. at 1046)).

22  *Id.* at 12–13 (some alterations in original).

23         The Court concluded that the record presented on Plaintiffs' previous motion suggested

24  resolving these claims "would require virtually a full trial for each MLO as to when and how they

25  worked, what records they or PNC might have retained, whether the MLO remembers how long

26  they spent in meetings and training sessions, and whether they recall working on selling loans

27  during that time," because Plaintiffs had not met their burden to show whether "representative or

28  statistical evidence might provide an alternative method of proof" in this particular case. *Id.* at

13–14.  The Court therefore declined to certify a class for claims based on nonproductive time other than rest periods, but left the door open for Scheid to file another motion pursuing certification of such claims.  *Id.* at 14.

### 2.    Standard for Predominance and Superiority Under Rule 23(b)(3)

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  Rule 23(b)(3) "is far more demanding" than the commonality test under Rule 23(a)(2).  *Id.* at 624.  That said, the Ninth Circuit has consistently "held that 'there is clear justification for handling the dispute on a representative rather than an individual basis' if 'common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication.'"  *Mazza*, 666 F.3d at 589 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998)).  Under Ninth Circuit law, complexity of individualized "damage calculations alone cannot defeat certification," *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013), but where plaintiffs "ha[ve] not demonstrated that . . . damages [attributable to the plaintiffs' theory] can be measured on a classwide basis, the predominance requirement is not satisfied," *Doyle v. Chrysler Grp., LLC*, 663 F. App'x 576, 579 (9th Cir. 2016) (emphasis added) (nonprecedential).  *See Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013) (reversing class certification where the plaintiffs failed to show "that damages are capable of measurement on a classwide basis"); *Leyva*, 716 F.3d at 513 (distinguishing *Comcast* and holding that a district court's denial of class certification on the basis that "highly individualized" damage calculations defeated predominance was a reversible error of law).

The Ninth Circuit recently addressed this standard in *Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918 (9th Cir. 2019), noting the burden shifting framework endorsed by the Supreme Court in *Mt. Clemens* and *Tyson Foods*, under which employees may rely on reasonable approximations to fill gaps left by an employer's failure to maintain required records of time worked.  *Senne*, 934 F.3d at 938–41.  The Ninth Circuit summarized *Tyson Foods* as follows:

> Stated another way, *Tyson* concluded that even where "reasonable minds may differ" about whether representative evidence is sufficiently probative of the requirements for liability for a particular

11

cause of action—in *Tyson*, whether it was probative of the "time actually worked by each employee"—that question is to be resolved by the jury, *not* at the class certification stage. [136 S. Ct.] at 1049 ("The District Court could have denied class certification on this ground [whether the representative evidence was "probative as to the time actually worked by each employee"] only if it concluded that *no reasonable juror* could have believed that the employees spent roughly equal time donning and doffing.") (emphasis added). If the proffered representative evidence, however, were "statistically inadequate or based on implausible assumptions," it "could not lead to a fair or accurate estimate of the uncompensated hours an employee has worked." *Id.* at 1048–49. But where the evidence is admissible— for expert evidence, using the *Daubert* standard—then the "no reasonable juror" standard at the class certification stage applies. *See id.* at 1049.

*Senne*, 934 F.3d at 940–41 (second alteration in original).

In *Tyson Foods*, the plaintiffs relied on an expert witness's study determining the average time employees took to don and doff protective gear. 136 S. Ct. at 1043. The defendant neither challenged the validity or reliability of the expert's opinions under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), nor offered a rebuttal expert presenting a contrary conclusion. *Tyson Foods*, 136 S. Ct. at 1044. In concluding that the plaintiffs had met their burden to provide representative evidence supporting a "just and reasonable" inference, the Supreme Court specifically noted that inadequate or implausible statistical conclusions would not suffice, but held that the defendant's failure to raise a *Daubert* challenge left assessing the reasonableness of the expert's calculations to "the near-exclusive province of the jury." *Id.* at 1048–49. The Supreme Court therefore concluded that the "District Court could have denied class certification on this ground only if it concluded that no reasonable juror could have believed that the employees spent roughly equal time donning and doffing," and the district court made no such finding. *Id.* at 1049.

The Ninth Circuit turned once more to *Tyson Foods* early this year, explaining in *Ridgeway* that class members may use representative evidence to prove their damages so long as it is reliable, and that "testimony from Wal-Mart drivers [could] amount to representative evidence." *Ridgeway*, 946 F.3d at 1087. In that case, "many plaintiffs testified about the length of their rest breaks and inspection time," in addition to an expert witness's testimony regarding statistical evidence. *Id.*; *see also Pierce v. Wyndham Vacation Resorts, Inc.*, 922 F.3d 741, 748 (6th Cir.

2019) (noting that "the court heard testimony from 43 of the 145 similarly situated salespeople")
(cited with approval by *Ridgeway*). But *Ridgeway*, like *Tyson Foods* and *Senne*, acknowledged
that "representative evidence and statistical evidence are not always proper." *Ridgeway*, 946 F.3d
at 1087.[5]

### 3.    Scheid Has Not Shown Sufficient Classwide Proof for Training

As a starting point, Scheid is correct that the *Tyson Foods* standard applies here based on
PNC's failure to maintain records that may have been required under California law. Section
226.2(a)(2) of the California Labor Code requires an employer to provide itemized statements
including each employee's total hours of nonproductive time, unless the employer pays an hourly
wage, separate from any incentive pay, for *all* hours worked. While it is possible that PNC could
prevail on a theory that its compensation plan in fact provides such regular pay—a merits issue not
presently before the Court—the issue of damages only becomes relevant if Scheid succeeds in
showing that PNC did not provide such pay. Accordingly, for the limited purpose of determining
whether proving how much nonproductive time class members spent on training raises individual
issues precluding class treatment, the Court assumes that PNC was required to maintain records of
such time under section 226.2(a)(2). The question, then, is whether Scheid has provided evidence
from which a "reasonable juror could . . . believe[] that the employees spent roughly equal time"
on training—or, in conjunction with PNC's records of what training each employee completed,
"roughly equal time" on each particular training module. *See Tyson Foods*, 136 S. Ct. at 1049.

PNC maintained records, or "transcripts," showing the training modules that each MLO

---

[5] Some cases considering *Mt. Clemens* in the context of proving damages on the merits, rather
than certifying a class, have suggested a more sweeping rule that "an award of back wages will not
be barred for imprecision where it arises from the employer's failure to keep records as required
by the FLSA." *Brock v. Seto*, 790 F.2d 1446, 1448 (9th Cir. 1986); *but see id.* (discussing a
plaintiff's burden to "'produce[] sufficient evidence to show the amount and extent of that work *as
a matter of a just and reasonable inference*'" (quoting *Mt. Clemens*, 328 U.S. at 687) (emphasis
added in *Brock*)). To the extent such cases could be read as holding that a plaintiff has *no* burden
to show *any* degree of precision in damages, this Court declines to apply such a rule for the
purpose of class certification, both because it would conflict with *Tyson Foods* and because the
policy underlying those decisions does not apply as strongly in this context. Employees are not
left without a remedy if class certification is denied, but instead could pursue individual actions
based on their own testimony regarding the time they personally spent on training or other
"nonproductive" tasks.

1    completed, including the dates of completion.  Swidler Decl. ¶ 5 & Ex. 1-D (dkt. 122-6);

2    Mackenzie Dep. at 100:16–102:18.  PNC also maintained records listing a "duration" for most if

3    not all of the training programs that it offered.  *See, e.g.*, Swidler Decl. Ex. 1-A (dkt. 122-2).

4    PNC's person most knowledgeable, Jasen Mackenzie,[6] testified that the "durations" listed

5    represent "an estimated maximum time to complete the curriculum," Mackenzie Dep. (dkt. 92-5)

6    at 35:19–23, or in other words, "the maximum time for median . . . comprehension," *id.* at 45:15–

7    23.  According to Mackenzie, those estimates are based on a standardized process considering "the

8    amount of topics within a module and the amount of words on a page."  *Id.* at 45:19–22.

9    Mackenzie testified that PNC had no other information "in its possession to dispute or challenge

10   or provide more clarification of the amount of time necessary to complete" the trainings.  *Id.* at

11   115:7–13.

12          Although MLOs were able to see the time they spent on a course after completing it,

13   Scheid Decl. ¶ 4, PNC kept no records of the actual time an MLO spent on a given course,

14   Mackenzie Dep. at 46:14–23.  Mackenzie states in a declaration that the "duration" was "not the

15   actual, nor is it an estimate, of the length of time a training course/module takes to complete," but

16   rather "a planning tool so that MLOs can set aside some time in their busy schedules to complete

17   the training within the target calendar completion date."  2d Mackenzie Decl. (dkt. 125-2) ¶ 5.[7]  In

18   some tension with Mackenzie's testimony, one training exercise includes an estimate of how much

19   time it would take to complete.  Swidler Reply Decl. Ex. 1 (dkt. 129-4) at PNC 3331 ("It will take

20   you approximately 60 minutes to complete the entire course, including the assessment.").  When

21   pressed on this issue at the hearing, however, class counsel did not assert that any other module

22   includes similar language presenting some amount of time as an actual estimate of how long

23

24   ---

     [6] The record is inconsistent as to whether the "k" in Mackenzie's name is capitalized.  This order
25   uses the format that appears below his signature on his declarations.
     [7] Scheid challenges Mackenzie's testimony on this point because he was not the person who
26   calculated the "duration" figures, and PNC did not offer testimony from Nancy Fox, the person
     who did.  Reply at 6.  Mackenzie testified on behalf of PNC as a corporate entity under Rule
27   30(b)(6), which does not require his own personal knowledge.  *See, e.g. Great Am. Ins. Co. of N.Y.
     v. Vegas Constr. Co.*, 251 F.R.D. 534, 539 (D. Nev. 2008).  If Scheid wished to challenge his
28   testimony on this subject, she could have sought to depose Fox.  There is no indication in the
     record that Scheid did so.

1   employees would take.  Counsel instead identified only other modules that include a figure

2   presented as "Time:", with no indication as to whether that amount of time was intended as a

3   maximum or a typical duration, or whether it was a reliable estimate of either.

4           Mackenzie also states that the amount of time MLOs would take to actually complete the

5   training modules varied considerably, and that MLOs could start and stop a given course to

6   complete it in more than one sitting.  2d Mackenzie Decl. ¶ 6.  Scheid states that she generally

7   took around the amount of time stated as the "duration" to complete trainings, Sched Decl. ¶ 4,

8   while Mackenzie stated in an earlier declaration that based on his own experience and his

9   knowledge of his subordinates, "the training modules take far less time to complete than the

10  calculate duration indicates," 1st Mackenzie Decl. (dkt. 91-11) ¶ 14.

11          Mackenzie states in a declaration that he sometimes witnessed MLOs conducting sales

12  work while they were playing videos included in PNC's training modules.  2d Mackenzie Decl.

13  ¶ 8.  Scheid states the training sessions required close attention in order to pass the tests included

14  at the end.  Scheid Decl. ¶ 4.  Mackenzie also states that employees could test or waive out of the

15  requirement to complete some trainings, and PNC's records would not always distinguish such

16  circumstances from an employee actually completing the training.  Mackenzie Dep. at 111:10–20;

17  2d Mackenzie Decl. ¶ 5.

18          Taken together, the evidence that Scheid offers to show common proof of the time that

19  MLOs spent completing particular training modules consists of: (1) "durations" of the courses,

20  with uncontroverted—except perhaps as to a single training module—testimony from PNC's

21  person most knowledgeable that the durations were intended as maximum rather than typical times

22  for completion; (2) testimony from a single MLO (herself) that she typically took the amount of

23  time stated as the "duration" to complete trainings, while another PNC employee (Mackenzie)

24  stated that he and his subordinates completed them more quickly;[8] and (3) the training exercises

25  _____

26  [8] For the sake of argument, the Court disregards the declarations that PNC offered on the initial
    class certification motion from other MLOs, which Scheid contends were obtained through
27  misconduct.  If the Court were to consider those declarations, they would not support Scheid's
    position that the "durations" listed by PNC were reliable estimates of the time MLOs spent on
28  training.  *See, e.g.*, Beagle Decl. (dkt. 91-3) ¶ 12 (stating that a particular MLO usually completed

15

themselves, which Scheid contends the jury could review and reach its own conclusions as to a

reasonable time for completion.

   None of this evidence indicates that PNC MLOs "spent roughly equal time" on the

trainings. *See Senne*, 934 F.3d at 940 (quoting *Tyson Foods*, 136 S. Ct. at 1049).  While employee

testimony itself can, in appropriate cases, constitute representative evidence, there is no basis here

for the Court or a jury to determine whether a single employee's testimony is representative—

particularly where it is contradicted by another employee's testimony.  *Cf. Ridgeway*, 946 F.3d at

1087 (discussing testimony from "many plaintiffs"); *Pierce*, 922 F.3d at 748 (considering

testimony from 43 similarly situated employees).

   Scheid's burden on this issue is not heavy.  Either an admissible expert report or consistent

testimony from some number of similarly situated employees would likely be sufficient to

overcome the "no reasonable juror" standard, *see Senne*, 934 F.3d at 940 (quoting *Tyson Foods*,

136 S. Ct. at 1049), even in the face of evidence from PNC tending to suggest otherwise.  It is

certainly conceivable that an expert might prepare such a report after conducting a study or

reviewing the training materials themselves, or that other employees might testify in a manner

consistent with Scheid.  But Scheid has offered no expert testimony that the Court could consider

under *Daubert*,[9] nor has she presented any other MLO's testimony regarding the time needed to

complete trainings.  It may be true that in this case, as in *Ridgeway* and *Tyson Foods*, "a

representative sample is the only practicable means to collect and present relevant data to show

damages." *Ridgeway*, 946 F.3d at 1088 (quoting *Tyson Foods*, 136 S. Ct. at 1046) (internal

quotation marks omitted).  Given that Scheid has not offered such a sample, that necessity cuts

---

trainings in a quarter of the "duration" stated); Lanteri Decl. (dkt. 91-7) ¶ 14 (stating that another
MLO typically completed trainings in "about one-third of the designated time").

[9] *Cf. Tyson Foods*, 136 S. Ct. at 1049 (holding that class certification was appropriate in part
because a defendant could have challenged the plaintiff's expert under *Daubert*, but did not).
Scheid suggests that the class could rely on a formula similar to the word– and topic-based system
used to calculate PNC's purported maximum durations in order to determine actual estimates.
Perhaps so, but there is no evidence before the Court that such a system is reliable.  Had Scheid
retained an expert witness to testify to this issue, PNC could have challenged the reliability of the
method under *Daubert*, and the Court could have determined whether the method is sufficiently
reliable to present to a jury.  The Court declines to hold that the *absence* of such evidence,
avoiding even the possibility of a challenge, places Scheid in a superior position.

United States District Court
Northern District of California

1  against granting her motion. *See Green v. Fed. Exp. Corp.*, 614 F. App'x 906, 907 (9th Cir. 2015)

2  (affirming denial of class certification where a plaintiff offered evidence only from employees at a

3  particular branch office).

4        The defect here, as on the previous motion, goes beyond the mere "need for individual

5  damages *calculations*" that the Ninth Circuit has repeatedly held cannot defeat class certification,

6  *see Ridgeway*, 946 F.3d at 1087 (emphasis added), and instead represents a more fundamental lack

7  of common evidence. While the Ninth Circuit has cautioned that predominance "is *rarely*

8  defeated on the grounds of differences among employees so long as liability arises from a

9  common practice or policy of an employer," it has recognized that such policies are "not a

10  guarantee that predominance will be satisfied." *Senne*, 934 F.3d at 938 (emphasis added; citation

11  and internal quotation marks omitted). This is the rare case where a plaintiff has failed to make a

12  sufficient showing to overcome the relaxed burden where such a policy exists. In the complete

13  absence of evidence suggesting that MLOs "spent roughly equal time" on the trainings, the Court

14  concludes that "no reasonable juror" could find on this record that the time spent by different

15  MLOs was "roughly equal." *Tyson Foods*, 136 S. Ct. at 1049. Based on the rule stated in *Tyson*

16  *Foods*, Scheid's motion to expand the scope of class certification is therefore DENIED.

17        **D.**   **Administrative Motions to File Under Seal**

18        Scheid filed two administrative motions to file documents under seal, one in connection

19  with her motion and one in connection with her reply brief. *See* dkts.122, 129. The only stated

20  basis for sealing is that PNC designated the documents as confidential. PNC did not file a

21  responsive declaration setting forth reasons for sealing as required by Civil Local Rule 79-5(e)(1).

22  Both administrative motions are therefore DENIED. Scheid shall file the documents at issue in

23  the public record no earlier than June 26, 2020 and no later than July 2, 2020. *See* Civ. L.R.

24  79-5(e)(2).

25  **IV.**   **CONCLUSION**

26        For the reasons discussed above, PNC's motion is GRANTED, Scheid's motion is

27  DENIED, and the scope of class certification is modified to include claims based on PNC's

28  alleged failure to pay for rest breaks from June 28, 2014 through June 29, 2019, and claims

derivative of such a theory, with a class defined as all individuals who were employed by PNC as mortgage loan officers during that time.

Scheid's administrative motions to file under seal are DENIED, and she is ordered to file documents in the public record as stated above.

**IT IS SO ORDERED.**

Dated: June 22, 2020

JOSEPH C. SPERO
Chief Magistrate Judge

United States District Court
Northern District of California