UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TANSEER KAZI, et al., | Case No. 18-cv-04810-JCS |
| Plaintiffs, | |
| v. | **ORDER REGARDING MOTIONS FOR PARTIAL SUMMARY JUDGMENT** |
| PNC BANK, N.A., | Re: Dkt. Nos. 158, 161 |
| Defendant. | |

## I.    INTRODUCTION

The Court previously granted in part a motion to certify a class of current or former mortgage loan officers ("MLOs") represented by Plaintiff Linda Scheid[1] (the "Class") asserting claims based on the purported failure of Defendant PNC Bank, N.A. ("PNC") to compensate rest breaks as required by California law. The parties have filed cross-motions for partial summary judgment, and the Court issued notice under Rule 56(f) that it would also consider whether the grant summary judgment for PNC on the issue of whether PNC's compensation policy complies with California law—a request not raised in PNC's motion, but instead first addressed in PNC's opposition to Plaintiffs' motion. The Court held a hearing on March 12, 2021. Each party's motion is GRANTED in part and DENIED in part, and the class definition is narrowed as discussed below.[2]

---

[1] Tanseer Kazi is also named as a plaintiff in this case, but the Court previously dismissed Kazi's claims without prejudice to him or his bankruptcy estate recovering as a member of the class. *See* Order Granting Pls.' Mot. to Dismiss (dkt. 144), *Kazi v. PNC Bank, N.A.*, No. 18-cv-04810-JCS, 2020 WL 5232602 (N.D. Cal. Sept. 2, 2020).

[2] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

United States District Court
Northern District of California

## II.    BACKGROUND

### A.    Factual Overview and Claims Asserted

During the period of time at issue, PNC provided incentive compensation for its MLOs using a formula based in large part on the MLOs' loan sales.  While PNC also provided a basic level of pay purportedly independent of incentive compensation, that basic pay was deducted from the calculation of incentive pay, such that in a given month an MLO would effectively receive *either* a portion of their loan sales *or* their base pay, whichever was larger.  In at least some circumstances, a negative balance on the calculation of incentive pay (after effectively deducting base pay) would carry over to future months.  Nevertheless, MLOs were never paid less than their regular pay for a given pay period, and failure to meet incentive goals would never result in them owing money to PNC at the end of their employment.  MLOs also received other forms of incentive pay besides the monthly incentives calculated from loan sales.  PNC allowed MLOs to take periodic rest breaks and instructed them to remain clocked in during those breaks, so MLOs would receive their regular pay for time spent on rest breaks.

There is no evidence or argument that MLOs' base pay, standing alone, would fail to provide sufficient compensation under California law for rest breaks or any other compensable time.  Plaintiffs' theory is that by effectively paying *only* incentive pay in months where MLOs qualified for it, PNC "recaptured" any pay for rest periods or other nonproductive time (although as discussed below, the Court has certified the Class only for the purpose of claims based on rest periods), and thus failed to pay MLOs for that time.  Plaintiffs assert the following claims: (1) "fail[ure] to provide paid rest periods or pay premium wages in lieu thereof as required by California Labor Code § 226.7" and certain wage orders, including waiting time penalties for class members whose employment ended during the class period, 2d Am. Compl. (dkt. 44-1) ¶¶ 22–26; (2) failure to pay for non-productive time as required by the California Labor Code and applicable wage orders, again including waiting time penalties for non-current employees, *id.* ¶¶ 27–32; (3) violation of California laws requiring accurate wage statements, *id.* ¶¶ 33–36; (4) violation of California's Unfair Competition Law as a result of the violations addressed in the previous claims, *id.* ¶¶ 37–41; and (5) a non-class, representative claim under California's Private Attorneys

General Act ("PAGA"), *id.* ¶¶ 42–47.

**B.    Previous Orders on Class Certification**

The Court previously granted in part Plaintiffs' motion to certify this case as a class action under Rule 23 of the Federal Rules of Civil Procedure. *See generally* Order re Mot. for Class Certification ("1st Class Cert. Order," dkt. 96).[3]  The Court held that with at least 119 members and potentially more than 200, the class satisfied the requirements of numerosity and ascertainability, which PNC did not dispute, *id.* at 5–6, and that "the question of whether the application of [PNC's] formula at least to months where MLOs received Plan Incentive Pay adequately compensates for rest breaks and other nonproductive time" satisfied Rule 23(a)(2)'s commonality requirement, *id.* at 6–9.  The Court concluded that although then-Plaintiff Tanseer Kazi could not serve as a class representative due to his bankruptcy, Plaintiff Linda Scheid met Rule 23's requirements of typicality and adequacy, and class counsel was also adequate for the purpose of that rule.  *Id.* at 14–15.  The Court denied class certification as to claims based on nonproductive time other than rest breaks, and denied a subsequent motion to expand the Class definition to include claims for time spent on training sessions.  Order re Mots. to Modify Class Certification ("2d Class Cert. Order," dkt. 134)[4] at 9–17.  The Court granted an unopposed motion by PNC to set an end date of June 30, 2019 for the Class.  *Id.* at 8–9.

Based on those previous orders, the Class was therefore defined as all individuals who were employed by PNC as mortgage loan officers from June 28, 2014 through June 29, 2019, and was certified only to pursue claims based on PNC's alleged failure to pay for rest breaks during that time, as well as claims derivative of such a theory.  *Id.* at 17–18.

**C.    Arguments**

**1.    Plaintiffs' Motion**

Plaintiffs seek partial summary judgment on two issues: (1) "Whether PNC Bank's MLO Compensation Plans failed to provide MLOs compensation for rest periods as required by

---

[3] *Kazi v. PNC Bank, N.A.*, No. 18-cv-04810-JCS, 2020 WL 607065 (N.D. Cal. Feb. 7, 2020). Citations herein to the Court's previous orders refer to page numbers of the versions filed in the Court's ECF docket.

[4] *Kazi v. PNC Bank, N.A.*, No. 18-cv-04810-JCS, 2020 WL 3414709 (N.D. Cal. June 22, 2020).

California law, Cal. Lab. Code § 226.7, and Section 12 of the IWC Wage Order 4-2001 such that PNC is liable for failure to provide rest periods"; and (2) "Whether the *Bland, et al. v. PNC Bank, N.A.* or the *Batta v. PNC Bank, N.A.* class settlements, under affirmative defenses of res judicata, settlement, release and/or accord and satisfaction, affect the relevant liability period for PNC's failure to pay compensation to MLOs for rest periods in violation of California law."  Pls.' Mot. (dkt. 161) at 1.

a.    <u>PNC's Compensation Plan</u>

Plaintiffs contend that PNC paid MLOs a $16 hourly wage, but then deducted that wage from commissions earned in that month or future months.  *Id.* at 14–15.  Since, in Plaintiffs' view, MLOs were effectively only paid commissions after their regular pay was recaptured as deductions, Plaintiffs contend that PNC failed to separately compensate them for their rest breaks, as required by California law.  *Id.* at 16.  Plaintiffs argue that even when MLOs did not earn commissions, they did not receive valid pay for their rest breaks because their regular pay created a deficit that would be applied to future commissions, and even when PNC forgave such deficits, it still deducted regular pay from commissions earned within a discrete period of time.  *Id.* at 17–18.

PNC argues that, contrary to Plaintiffs' contention that it paid MLOs an hourly wage that served as a revocable advance on commissions, it in fact paid MLOs an unconditional biweekly salary that was not subject to recapture.  Def.'s Opp'n (dkt. 164) at 4–7.  According to PNC, the cases on which Plaintiffs rely are distinguishable because, among other reasons, they involved hourly pay rather than salaries, incentive pay was characterized as earned commissions, and regular pay was characterized as a draw against those commissions.  *Id.* at 10–12.  PNC contends that this case is controlled by the California Supreme Court's recent decision in *Oman v. Delta Air Lines*, 9 Cal. 5th 762 (2020), which held (on certification of a question from the Ninth Circuit) that non-hourly compensation schemes need not specifically attribute a particular amount above the minimum wage to each hour of compensable work so long they ensure that employees receive more than minimum wage, and thus affirmed summary judgment for an airline that paid its flight attendants by work rotation using formulas that always ensured an effective hourly rate greater

4

United States District Court
Northern District of California

1   than the minimum wage.  Def.'s Opp'n at 12–14.  PNC characterized *Oman* as having narrowly

2   construed the line of California cases on which Plaintiffs rely, and as consistent with earlier

3   California decisions allowing employers leeway in structuring incentive compensation that might

4   depend on factors impermissible in setting regular pay.  *Id.* at 14–19.[5]  PNC contends that it

5   always provided sufficient compensation satisfying California's requirements for minimum wage

6   and pay for rest breaks, based on a combination of MLOs' salaries, any incentive pay MLOs

7   might earn under PNC's compensation plan for loans they sold, and other incentive pay separate

8   from that compensation plan.  *Id.* at 19–22.  At the conclusion of its argument on this issue in its

9   opposition brief, PNC requests summary judgment in its favor even though it did not raise the

10   issue in its own motion, citing Rule 56(f) of the Federal Rules of Civil Procedure for the principle

11   that a court may grant summary judgment for a nonmovant.  *Id.* at 22.

12         Plaintiffs contend in their reply that PNC in fact paid its MLOs commissions, citing a

13   comment by the Court at the class certification hearing highlighting PNC documents that used that

14   term.  Pls.' Reply (dkt. 169) at 1.  Plaintiffs also argue that PNC's documents show that MLOs'

15   base pay functioned as a draw against commissions, and if it was a salary rather than a draw as

16   PNC contends, then PNC's deduction of that amount from future incentive pay would violate

17   California laws prohibiting employers from recapturing wages paid to employees.  *Id.* at 1–5.

18   Plaintiffs dispute PNC's characterization of *Oman*, arguing that it confirmed rather than limited

19   the holdings of the cases on which Plaintiffs rely, and that the facts at hand are indistinguishable

20   from a recent unpublished Ninth Circuit decision addressing mortgage consultants at Wells Fargo.

21   *Id.* at 5–9.  According to Plaintiffs, it is immaterial that some MLOs never sold enough loans to

22   actually receive Plan Incentive Pay.  *Id.* at 9–11.  Plaintiffs also contend that other bonuses and

23   "forgivable draws" issued by PNC do not satisfy its obligation to pay for rest breaks.  *Id.* at 11–12.

24

---

25   [5] One of the cases on which PNC relies is the California appellate decision *Murcia v. Tanimura &
26   Antle Fresh Foods, Inc.*, No. H045418, 2020 WL 1672686 (6th Dist. Cal. Ct. App. Apr. 6, 2020).
     *See* Def.'s Opp'n at 16.  Rule 8.1115 of the California Rules of Court, incorporated by this Court's
27   Civil Local Rule 3-4(e), prohibits citation of that unpublished opinion.  That rule is distinct from
     the Ninth Circuit's treatment of its own unpublished decisions since January 1, 2007, which are
28   not precedent but may nevertheless be cited for their persuasive value.  *See* Fed. R. App. P.
     32.1(a); 9th Cir. R. 36-3(b).  The Court therefore disregards *Murcia*.

After briefing closed, the Court issued notice that it would consider the request for summary judgment raised in PNC's opposition brief, and allowed Plaintiffs to file a response raising any procedural objections no later than March 3, 2021, although the Court noted that a lack of procedural objection would not be construed as non-opposition to summary judgment on the merits. *See* Order Providing Notice of Potential Summ. J. for Non-Movant (dkt. 174). Plaintiffs did not file a response.

b.   <u>Prior Class Settlements</u>

Plaintiffs argue that they are entitled to summary adjudication that the class settlement in *Bland* v. *PNC Bank, N.A.*, No. 2:15-cv-01042-AJS (W.D. Penn.), which released certain claims through January 4, 2017, does not bar their claims from before that date because that case concerned unpaid wages, while California courts have treated failure to provide rest breaks under section 226.7 of the Labor Code as a claim distinct from nonpayment of wages. Pls.' Mot. at 18. Plaintiffs also contend that *Bland* did not arise from an identical factual predicate as their claims here, as required in the Ninth Circuit for a settlement to bar absent class members from bringing related claims, or invoke the same primary right as their claims here, as required for res judicata under California law. *Id.* at 21–23. Plaintiffs assert that the settlement in *Batta v. PNC Bank, N.A.*, No. MSC15-00728 (Cal. Super. Ct., Contra Costa)—which PNC did not address in its answer, but raised later in litigation—does not bar the claims here because it released only claims related to failure to reimburse or indemnify business expenses. *Id.* at 23.

PNC argues that the federal test for res judicata applies because the judgment in *Bland* was entered by a federal court, and both cases arise from the same nucleus of operative facts— purported nonpayment of compensation that was later deducted from incentive pay. Def.'s Opp'n at 23. PNC contends that California law treats payment for rest breaks the same as payment for work, and this case does not concern *denial* of rest breaks, only alleged nonpayment. *Id.* at 24–25. PNC does not address *Batta* in its opposition brief. *See id.* at 22–25.

In their reply, Plaintiffs argue that because the complaint in *Bland* did not address rest breaks or nonproductive time, it did not arise from the same factual predicate as their claims here. *Id.* Pls.' Reply at 12–13.

### 2. PNC's Motion

PNC moves for partial summary judgment on three issues: (1) "The doctrines of res judicata, settlement, and release completely bar the claims of 88 Class members and partially bar the claims of 45 other Class members"; (2) "The Class' wage statement claim fails as a matter of law"; and (3) "The Class' termination pay/waiting time penalty claims fail as a matter of law." Def.'s Mot. (dkt. 158) at 1.

#### a.   Effect of Settlements

PNC asserts that 133 of the 210 MLOs in the Class here were members of the *Bland* class action and argues that those MLOs' claims are barred for work performed through the January 4, 2017 release date of that settlement, and that of those 133 Class members, 88 ended their employment with PNC before that date and thus have no claims here. *Id.* at 3–5, 7–16.  As in its opposition brief discussed above, PNC argues that the federal test for res judicata applies, requiring identity of claims, a final judgment on the merits, and privity. *Id.* at 7 & n.10. According to PNC, privity is established for Class members here who were also members of the *Bland* class, and a class settlement serves as a final judgment on the merits. *Id.* at 8–9.  PNC argues that the claims in *Bland*, which were based on deduction of salary from future incentive payments, encompass the claims here for failure to compensate rest breaks as a result of the same deduction scheme. *Id.* at 9–15.

Plaintiffs argue that the estoppel effect of *Bland* is determined not by general res judicata principles, but by the scope of the release included in the settlement agreement, which only encompassed claims based on the allegations of the complaint in that case, and did not extend to related claims that could have been raised.  Pl.'s Opp'n (dkt. 167) at 1, 13–14.  According to Plaintiffs, those allegations do not encompass their claims here, because *Bland* did not include allegations regarding rest breaks and instead sought compensation for "hours worked." *Id.* at 1–2, 4–8.  Plaintiffs also argue that due process requires claims released by absent class members to arise from an identical factual predicate as the claims asserted, which Plaintiffs contend is not satisfied here, most broadly because rest breaks are not hours worked, and more narrowly with respect to their claim for waiting time penalties because that issue was not addressed in *Bland*. *Id.*

United States District Court
Northern District of California

United States District Court
Northern District of California

1   at 2, 9–12.  Even if the Court applies the more general test for res judicata rather than looking to

2   the terms of the settlement, Plaintiffs argue that their claims here are sufficiently distinct to avoid

3   preclusion.  *Id.* at 14–15.  Plaintiffs concede that Scheid's individual claim for failure to

4   compensate nonproductive time other than rest breaks—an issue for which the Court denied class

5   certification—is barred by *Bland* for work Scheid performed before January 5, 2017.  *Id.* at 4.

6         PNC contends in its reply that any of the possible tests for preclusion would focus on the

7   factual overlap between *Bland* and this case, and that the *Bland* release's broad language

8   (concerning any wage-and-hour claim that could have been asserted based on the allegations in

9   that case) encompasses Plaintiffs' claims here.  Def.'s Reply (dkt. 168) at 1–3.  PNC argues that

10  the complaint in *Bland* detailed the same compensation scheme at issue here.  *Id.* at 3–6.  PNC

11  also argues that both federal law and California law define "hours worked" as including rest

12  breaks.  *Id.* at 6–8.  According to PNC, this case concerns only its purported failure to *pay* for rest

13  breaks, not denial of opportunity to take rest breaks, and the cases on which Plaintiffs rely are

14  distinguishable.  *Id.* at 8–9.

15        PNC also asserts that Class members Ming Lo and Taylor Lancaster entered individual

16  settlement agreements with broad releases encompassing all claims here.  Def.'s Mot. at 5, 15, 16.

17  Plaintiffs argue that under section 206.5 of the Labor Code, wages not subject to a bona fide

18  dispute must be paid without condition and cannot be subject to a release, and that PNC has not

19  shown that condition to be satisfied for Lo and Lancaster's settlements.  Pl.'s Opp'n at 2, 15.  PNC

20  responds that the authority on which Plaintiffs rely pertains to releases included on the back of

21  paychecks, not to settlement agreements, and that the releases in Lo and Lancaster's settlements

22  are enforceable.  Def.'s Reply at 9–10.

23                    b.      Wage Statement and Waiting Time Claims

24        PNC contends that Plaintiffs cannot recover penalties for inaccurate wage statements

25  because, even if the Court determines that PNC's compensation plan was inadequate, MLOs'

26  wage statements always accurately reflected the amount they were actually paid.  Def.'s Mot. at

27  16–22.  According to PNC, that conclusion is compelled by the California appellate decisions

28  *Maldonado v. Epsilon Plastics, Inc.*, 22 Cal. App. 5th 1308 (2018), and *Naranjo v. Spectrum*

*Security Services, Inc.*, 40 Cal. App. 5th 444 (2019), *review granted*, 455 P.3d 704 (Cal. 2020). Def.'s Mot. at 16–22. PNC argues that *Maldonado* stands for a rule that wage statements are not insufficient so long as they accurately reflect the amount paid, even if that amount did not satisfy the employer's more substantive obligations, and that *Naranjo* forecloses a wage statement claim based on a rest break claim under section 226.7, because such a claim is not based on nonpayment of wages. *Id.* at 18–20. Similarly, PNC argues that MLOs cannot recover waiting time penalties under section 203 for failure to pay wages upon termination of employment because any premiums that may have been due under section 226.7 were not wages within the meaning of section 203, relying again on *Naranjo*. *Id.* at 22–24.

Plaintiffs contend that *Maldonado* is inapposite because did not address failure to disclose premium hours, as Plaintiffs argue their wage statements should have disclosed here for PNC's alleged failure to provide rest breaks in accordance with California law, and that *Naranjo* has been stripped of precedential value by the California Supreme Court granting review and is likely to be reversed. Pls.' Opp'n at 2–3, 16–22. PNC argues again in its reply that the wage statements at issue accurately reflected Plaintiffs' hours work and compensation received, and that *Naranjo* correctly held that failure to pay premiums under section 226.7 cannot support a wage statement or waiting time claim. Def.'s Reply at 10–15.

## III.   ANALYSIS

### A.   Legal Standard

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "'specific facts showing there is a genuine issue for trial.'" *Id.* (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely

disputed must support the assertion by . . . citing to particular parts of materials in the record

. . . .").  "[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the

substantive evidentiary standard of proof that would apply at the trial on the merits."  *Anderson v.*

*Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986).  The non-moving party has the burden of

identifying, with reasonable particularity, the evidence that precludes summary judgment.  *Keenan*

*v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  Thus, it is not the task of the court "'to scour the

record in search of a genuine issue of triable fact.'"  *Id.* (citation omitted); *see Carmen v. S.F.*

*Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); Fed. R. Civ. P. 56(c)(3).

A party need not present evidence to support or oppose a motion for summary judgment in

a *form* that would be admissible at trial, but the *contents* of the parties' evidence must be amenable

to presentation in an admissible form.  *See Fraser v. Goodale*, 342 F.3d 1032, 1036−37 (9th Cir.

2003).  Neither conclusory, speculative testimony in affidavits nor arguments in moving papers

are sufficient to raise genuine issues of fact and defeat summary judgment.  *Thornhill Publ'g Co.,*

*Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  On summary judgment, the court draws all

reasonable factual inferences in favor of the non-movant, *Scott v. Harris*, 550 U.S. 372, 378

(2007), but where a rational trier of fact could not find for the non-moving party based on the

record as a whole, there is no "genuine issue for trial" and summary judgment is appropriate.

*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

Applying that standard to the cross-motions for summary judgment at hand, the Court

draws all reasonable inferences in favor of PNC for the purpose of Plaintiffs' motion, and all

reasonable inferences in favor of Plaintiffs for the purpose of PNC's motion.

**B.    Rest Breaks, Wage Borrowing, and Complex Compensation Plans**

Section 226.7 of the California Labor Code provides that employers cannot require

employees to work during rest periods mandated by IWC wage orders and that rest periods "shall

be counted as hours worked, for which there shall be no deduction from wages."  Cal. Lab. Code

§ 226.7(b), (d).  Wage Order 4-2001, which governs the employees at issue in this case, requires

rest breaks as follows:

Every employer shall authorize and permit all employees to take rest

> periods, which insofar as practicable shall be in the middle of each work period. The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof. However, a rest period need not be authorized for employees whose total daily work time is less than three and one-half (3 1/2) hours. Authorized rest period time shall be counted as hours worked for which there shall be no deduction from wages.

Cal. Code Regs. tit. 8, § 11040(12)(A) ("Wage Order 4"). An employer who fails to provide a rest break "in accordance with" state law or Wage Order 4 must provide "one additional hour of pay at the employee's regular rate of compensation for each workday that the . . . rest . . . period is not provided." Cal. Lab. Code § 226.7(c); *see* Wage Order 4, § 12(B). As explained by a recent California appellate decision, if an employer allows its employees to take rest breaks but fails to compensate that time in accordance with the Labor Code and applicable wage orders, the employees can recover either wages that should have been paid for the breaks or the one-hour daily premium under section 226.7(c), but not both. *Sanchez v. Martinez*, 54 Cal. App. 5th 535, 546–47 (2020), *review denied*, No. S265102 (Cal. Dec. 23, 2020).

The series of cases addressing the interplay between California's rest break requirements and employers' complex, non-hourly compensation systems begins with a case that involved neither. In *Armenta v. Osmose, Inc.*, 135 Cal. App. 4th 314 (2005), a company that maintained utility poles paid its employees hourly wages, but did not compensate them for certain tasks that the court determined were compensable. 135 Cal. App. 4th at 317, 319–20. The company argued that because the employees "were paid an hourly wage far in excess of the minimum wage," it should be permitted to average the total amount an employee received for a given pay period across the number of hours actually worked to show that the employee received more than minimum wage. *Id.* at 319. The trial court and appellate court rejected that view, holding that "all hours must be paid at the statutory or agreed rate and no part of this rate may be used as a credit against a minimum wage obligation," relying in part on statutes prohibiting employers from collecting or withholding any part of an agreed wage. *Id.* at 323 (citing Cal. Lab. Code §§ 221–23).

A later case applied that principle to claims brought by truck drivers who received a piece-rate pay based on mileage, as well as "fixed rates for certain tasks and hourly rates for other tasks

and delays," but no separate payment for rest periods.  *Bluford v. Safeway Inc.*, 216 Cal. App. 4th 864, 872 (2013).  The defendant, Safeway, argued that its mileage rate was designed to include payment for rest breaks taken while driving, but the court held that such an approach was "akin to averaging pay to comply with the minimum wage law instead of separately compensating employees for their rest periods at the minimum or contractual hourly rate," as prohibited by *Armenta*.  *Id.*  The court "conclud[ed] Safeway was required to separately compensate for rest periods and was precluded from building compensation into its mileage rates for rest periods."  *Id.* at 873.  Another case from around the same time applied the principle of *Armenta* to time that mechanics who were paid on a piece-rate basis spent on duty waiting for work they could perform. *Gonzalez v. Downtown LA Motors, LP*, 215 Cal. App. 4th 36, 42, 48–49 (2013).

Perhaps the closest California case to the facts here, in that it involved sales associates paid on commission, is *Vaquero v. Stoneledge Furniture LLC*, 9 Cal. App. 5th 98 (2017), on which Plaintiffs rely heavily.  "If a sales associate failed to earn 'Minimum Pay' of at least $12.01 per hour in commissions in any pay period, Stoneledge paid the associate a 'draw' against 'future Advanced Commissions.'"  9 Cal. App. 5th at 103.  That "draw"—the shortfall between the commissions the associate earned and the $12.01 minimum hourly rate—was deducted from any future commissions, but the employee always received at least $12.01 per hour worked.  *Id.*  Like here, associates were encouraged to take rest breaks and remained on the clock during those breaks, resulting in rest periods being compensated in the same manner as working time.  *Id.*

The court concluded that the applicable wage order, which includes language identical to the relevant portion of Wage Order 4, "covers employees paid by commission" and requires separate pay for rest breaks.  *Id.* at 110–14.  The court further concluded that the defendant's payment system—consisting of commissions when an associate sold above a certain threshold, an hourly wage when they did not, and deductions of such wages from any future commissions— failed to compensate for rest breaks:

> For sales associates whose commissions did not exceed the minimum rate in a given week, the company clawed back (by deducting from future paychecks) wages advanced to compensate employees for hours worked, including rest periods. The advances or draws against future commissions were not compensation for rest periods because

they were not compensation at all. At best they were interest-free loans. Stoneledge cites no authority for the proposition that a loan for time spent resting is compensation for a rest period. To the contrary, taking back money paid to the employee effectively reduces either rest period compensation or the contractual commission rate, both of which violate California law. (See § 221 [prohibiting employers from collecting or receiving from an employee "any part of wages theretofore paid by said employer"]; § 222 [prohibiting employers from withholding any part of a wage agreed upon]; § 223 [prohibiting employers from "secretly pay[ing] a lower wage while purporting to pay the wage designated by statute or by contract"]; cf. *Armenta*, supra, 135 Cal. App. 4th at p. 323 [averaging wages across pay periods to satisfy minimum wage requirements "effectively reduces [employees'] contractual hourly rate"].)

Thus, when Stoneledge paid an employee only a commission, that commission did not account for rest periods. When Stoneledge compensated an employee on an hourly basis (including for rest periods), the company took back that compensation in later pay periods. In neither situation was the employee separately compensated for rest periods.

*Id.* at 115–16 (brackets in original).  The court placed significant weight on the fact that an employee would likely receive lower total compensation as a result of taking rest breaks, because time spent at rest would not contribute in any way to earning commissions.  *Id.* at 112, 116.

In *Barreras v. Wells Fargo Bank, N.A.* ("*Wells Fargo I*"[6]), the Central District of California granted partial summary judgment for a class of home mortgage consultants whose compensation plans with Wells Fargo provided for an hourly rate of pay, but characterized that pay as an advance on commissions, which could reduce the amount of future commissions received but would never otherwise be recovered by Wells Fargo from an employee.  *Wells Fargo I*, No. CV 17-4344 PA (ASx), 2018 WL 5276294, at *2–3 (C.D. Cal. Jan. 19, 2018).[7]  As with the

---

[6] Because the named plaintiff in the caption of this case changed between the district court's decision and the Ninth Circuit's, this order refers to the case by the defendant's name for clarity.
[7] "'For purposes of this Plan, all hourly pay and other paid time (e.g., Paid Time Off, Paid Holidays) is an advance against monthly commissions and Performance Scorecard Bonuses, and also against all incentives that Employee is otherwise eligible to earn under this Plan . . . . As such, Employee's hourly pay and other paid time is referred to as Advances on Commissions, and . . . Employee will be credited commissions and other incentives under this Plan only to the extent the gross received incentive amounts exceed the hourly pay the employee has received.'" *Wells Fargo I*, 2018 WL 5276294, at *2 (quoting the compensation plan; ellipses in original).  "'The fact that hourly pay (Advances on Commissions) is taken into account in calculating net commissions/incentives under this Plan shall not give Employer the right to recover any hourly pay back from any employee.  Hourly pay is fully vested when received and is not subject to recapture by Employer under any circumstances.'"  *Id.* at *3 (quoting the compensation plan).

PNC MLOs in this case, the Wells Fargo mortgage consultants took rest breaks without clocking

out, so their rest periods were included in their hourly pay.  *Id.* at *4.  Also like this case, the

Wells Fargo mortgage consultants received their regular pay biweekly, and any commissions they

might have earned (after deducting that regular pay) monthly.  *Id.* at *7.  The district court found

no distinction from *Vaquero*, and thus concluded that Wells Fargo's plan violated Wage Order 4

and section 226.7 of the Labor Code for failure to compensate for rest breaks.  *Id.* at *6–8 ("An

HMC whose commissions have in the aggregate matched or exceeded their hourly pay . . .

receives wages for a month that are based on his or her commissions . . . . Such an HMC's wage is

entirely dependent on the HMC's sales activity; it is not affected by whether or not the HMC takes

a rest break.").  In an unpublished decision, the Ninth Circuit affirmed for the same reasons, and

declined to reduce damages based on class members who only ever received hourly pay because

Wells Fargo failed to prove that any such class members existed—the parties stipulated to a

number of employees that Wells Fargo *contended* never received commissions, but not that Wells

Fargo was correct in that contention.  *Ibarra v. Wells Fargo Bank, N.A.* ("*Wells Fargo II*"), 809 F.

App'x 361, 363–64 (9th Cir. 2020).[8]

In the California Supreme Court's 2020 *Oman* decision, Delta Air Lines used a

compensation system in which flight attendants were paid per work rotation, each of which

consisted of a number of "duty periods," as well as non-compensable layovers.  9 Cal. 5th at 783–

84.  Delta determined in advance the minimum amount to be paid for a particular rotation by

applying one of three formulas to each duty period or an alternative fourth formula to the rotation

as a whole—whichever resulted in the highest total.  *Id.* at 784 & n.6  One formula "multipl[ied]

---

[8] Plaintiffs incorrectly characterize *Wells Fargo II* as "binding Ninth Circuit precedent," which this Court must follow in the absence of any subsequent change to state law.  Pls.' Reply at 5.  As an unpublished memorandum disposition, *Wells Fargo II* is "not precedent, except when relevant under the doctrine of law of the case or rules of claim preclusion or issue preclusion."  9th Cir. Rule 36-3; *see also Wells Fargo II*, 809 F. App'x 361, 362 n.* ("This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3."). *Wells Fargo II*—like the district court's decision in *Wells Fargo I*—is relevant only to the extent that its reasoning is persuasive.  The Court notes that *Wells Fargo* predated *Oman* by a matter of months and thus had no occasion to consider the significance of the California Supreme Court's decision in that case, and that neither *Wells Fargo* decision adds significant analysis beyond *Vaquero*, which is stronger authority as to California law than these non-precedential federal decisions.

the attendant's established flight pay rate by the total hours in [each] duty period, divided by two." *Id.* at 784.  Since all flights attendants' "flight pay" rates were greater than twice the minimum wage, that method would always pay more than minimum wage for the duty period.  *Id.* at 784–85.  A second formula, which in practice applied to most duty periods, calculated pay based only on flight time: the flight attendant would receive their "flight pay" rate in full for each hour of flight, but other on-duty time (like preflight briefings) were not relevant to the calculation.  *Id.* at 785–86.  But since Delta's plan applied the formula that resulted in the highest compensation, that formula would never apply to a duty period made up of more non-flight time than flight time—the first formula would apply instead, and the flight attendant would receive more than minimum wage.  *Id.* at 786.  The two other formulas, addressed only briefly in *Oman*, provided for a minimum fixed payment per duty period, and for a minimum hourly rate for rotations with long off-duty layovers.  *Id.* at 784.  Flight attendants would request rotations based on a "bid packet" that included, among other information, "which formula will apply and the minimum amount flight attendants would be paid for the rotation."  *Id.*

Rejecting the plaintiff's claim that the formula based on flight time failed to pay minimum wage for non-flight work, the California Supreme Court determined that "the scheme, taken as a whole, does not promise any particular compensation for any particular hour of work; instead, as discussed above, it offers a guaranteed level of compensation for each *duty period* and each *rotation*."  *Id.* at 786.  The court concluded that "there are no on-duty hours for which Delta contractually guarantees certain pay," and that there was "no evident inadequacy or unfairness in permitting Delta to compensate flight crew members on a per-rotation basis, at a level no less than contractually promised and in excess of the hourly minimum wage—nor is there any unfairness in permitting Delta to increase that compensation when, for example, duty periods include a greater percentage of flight time or rotations include more drawn-out off-duty layovers between duty periods."  *Id.* at 787.

In reaching the conclusion that Delta's compensation plan complied with minimum wage law, the California Supreme Court distinguished "no borrowing" cases from the issues before it:

Although we have not previously had occasion to address the issue,

we agree with this consensus [of cases including *Vaquero*, *Bluford*, *Gonzalez*, and *Armenta*]: State law prohibits borrowing compensation contractually owed for one set of hours or tasks to rectify compensation below the minimum wage for a second set of hours or tasks, regardless of whether the average of paid and unpaid (or underpaid) time exceeds the minimum wage. Even if that practice nominally might be thought to satisfy the requirement to pay at least minimum wage for each hour worked, it does so only at the expense of reneging on the employer's contractual commitments, in violation of the contract protection provisions of the Labor Code.

Synthesizing the authorities, we summarize the principles this way. The compensation owed employees is a matter determined primarily by contract. Compensation may be calculated on a variety of bases: Although nonexempt employee pay is often by the hour, state law expressly authorizes employers to calculate compensation by the task or piece, by the sale, or by any other convenient standard. [Citing Cal. Lab. Code § 200(a); Wage Order No. 9, § 4(B).] In many employment agreements, such as the one at issue in *Armenta* [where the employer paid hourly wages], the unit of time or activity by which an employer promises to pay an employee is easily ascertainable. In other cases, the employer may compensate employees based on a combination of methods. (See, e.g., *Vaquero*, *supra*, 9 Cal. App. 5th at p. 103, 214 Cal. Rptr. 3d 661 [compensation determined by the greater of sales commission or hourly minimum pay]; *Gonzalez*, *supra*, 215 Cal. App. 4th at p. 41, 155 Cal. Rptr. 3d 18 [compensation determined by greater of repair tasks completed or minimum hourly pay].) Consistent with general contract interpretation principles, the unit for which pay is promised should be determined based on the "mutual intention of the parties as it existed at the time of contracting." (Civ. Code, § 1636.)

Whatever the task or period promised as a basis for compensation, however, an employer must pay no less than the minimum wage for all hours worked. (See Wage Order No. 9, §§ 2(H), 4.) The employer must satisfy this obligation while still keeping any promises it has made to provide particular amounts of compensation for particular tasks or periods of work. (Lab. Code, §§ 221–223.) For all hours worked, employees are entitled to the greater of the (1) amount guaranteed by contract for the specified task or period, or (2) the amount guaranteed by the minimum wage. Whether a particular compensation scheme complies with these obligations may be thought of as involving two separate inquiries. First, for each task or period covered by the contract, is the employee paid at or above the minimum wage? Second, are there other tasks or periods not covered by the contract, but within the definition of hours worked, for which at least the minimum wage should have been paid?

For purposes of evaluating whether an employee has received at least the hourly minimum wage for tasks or periods compensated under the contract, it is generally permissible to translate the contractual compensation—whether it be done by task, work period, or other reasonable basis—into an hourly rate by averaging pay across those tasks or periods. An employer can, for example, pay by the day, with daily pay averaged across all hours worked to determine whether the resulting hourly wage exceeds the minimum. But an employer who instead promises to pay by the hour may not compensate any given

16

hour at less than minimum wage. Nor may the employer make up for the shortfall by pointing to other hours for which contractual compensation exceeds the minimum wage. As the DLSE explained in its letter, if a contract or bargaining agreement expressly guarantees compensation for one set of tasks or one specific period, that compensation may not be reduced to supplement pay for other tasks or periods within the purview of the contract or bargaining agreement, but otherwise undercompensated by them. (DLSE Opn. Letter No. 2002.01.29, supra, at p. 11; Lab. Code, §§ 221–223.)

The same "no borrowing" principle applies when an employer requires work not covered by the contract at all, but which falls within the definition of hours worked under the minimum wage law. So, for example, in *Armenta*, . . . the collective bargaining agreement ensured pay at or above the minimum wage for hours engaged in specified productive tasks, and under the agreement and Labor Code section 222, the employees were entitled to their promised wages without diminution. But for other periods not compensated under the contract, but during which employees were on duty and thus owed compensation under the wage order, the minimum wage was also due.

*Id.* at 781–83 (some brackets in original).[9]

Justice Liu's concurrence in *Oman*, joined by Justice Cuéllar, cautioned that "[c]ourts should be careful not to allow employers to characterize their contractual commitments in ways that would effectively circumvent the no-borrowing rule" by, for example, "inserting into employment agreements a minimum wage floor—i.e., an agreement to make up the difference if an employee's promised pay, averaged over all hours worked, falls below the applicable minimum wage." *Id.* at 790–91 (Liu, J., concurring). Justice Liu construed *Vaquero* and *Gonzalez* as "recogniz[ing] that employers cannot circumvent their obligation to pay employees for all hours worked or to pay the full amount of commissions, piece rates, or other compensation promised to

---

[9] In a recent decision identified by PNC after briefing had concluded, the Ninth Circuit relied on *Oman* to reverse summary judgment granted against a different airline, Virgin America, on claims for failure to pay minimum wage and compensation for all hours worked. *See Bernstein v. Virgin Am., Inc.*, ___ F.3d ___, Nos. 19-15382 et al., 2021 WL 867583, at *5–6 (9th Cir. Feb. 23, 2021) (as amended Mar. 8, 2021). The Ninth Circuit found no relevant distinction between Delta's compensation system in *Oman* and Virgin America's very similar compensation system, rejecting the plaintiffs' argument that a flight attendant could theoretically be ordered to report many hours before a flight and not sufficiently compensated, because the plaintiffs did "allege[] that this ever happened, nor that it would plausibly happen." *Id.* at *6. The Ninth Circuit affirmed summary judgment for the plaintiffs on rest break, meal break, wage statement, waiting time, and other wage-and-hour claims, because the panel determined that California law applied to the employees at issue and was not preempted, and Virgin America did not argue that it complied with those provisions of California law. *Id.* at *6–11. *Bernstein* adds little to the analysis here except to confirm that the Ninth Circuit, as it must, has followed the California Supreme Court's interpretation of state law.

United States District Court
Northern District of California

1    employees simply by inserting a minimum wage floor into an employment agreement." *Id.* at 792.

2           Following its decision in *Oman*, the California Supreme Court vacated an appellate

3    decision affirming summary judgment for an employer in *Certified Tire & Service Centers Wage*

4    *& Hour Cases*, 28 Cal. App. 5th 1 (2018), remanding with instructions to reconsider in light of

5    *Oman*.  473 P.3d 312 (Cal. 2020).  Both parties here argue that the remand instructions in *Certified*

6    *Tire* support their respective positions.  Def.'s Opp'n at 16; Pl.'s Reply at 8.  The Court disagrees,

7    and discerns from those instructions no relevant information about the state of California law

8    beyond the precedent discussed above.

9           **C.    PNC's Compensation Plan Violated California Law**

10          Here, PNC always paid its MLOs a base rate of compensation.  Smiles MSJ Decl. (dkt.

11   163-6) ¶¶ 3–4.  PNC characterizes that pay as a salary (with additional pay for overtime) and

12   Plaintiffs characterize as an hourly wage, but Plaintiffs do not dispute that, standing alone, the

13   base pay would satisfy minimum wage requirements.  PNC encouraged MLOs to take rest breaks

14   consistent with Wage Order and instructed them to remain clocked in during those breaks, so the

15   base rate of pay—again, standing alone—would include adequate compensation for rest breaks.

16          In addition to that base rate of pay, PNC offered various forms of additional incentive

17   compensation.  Some such compensation was not tied directly to loan sales, such as onboarding

18   incentives or bonuses determined by local management, and is of limited relevance.  *See id.* ¶ 11.

19   The incentive compensation at the heart of this case, PNC's "Plan Incentive Pay," was tied to loan

20   sales, in a manner resembling—if not constituting, as PNC disputes—commissions.  The

21   calculation of that incentive pay was derived in large part on a percentage of the MLOs' loan sales

22   (calculated using basis points that varied depending on the type and size of the loan), as well as

23   other factors like compliance with company policies, but subtracted the MLO's regular pay (plus

24   any deficit carried over from previous months) before reaching a total.  *See, e.g.*, *id.* ¶¶ 5–6;

25   Swidler Decl. (dkt. 160-6) Ex. 1-J (compensation plan effective January 1, 2017).  Deficits in one

26   month, where an MLO's Plan Incentive Pay did not exceed the MLO's regular pay and certain

27   other costs, were typically carried over to subsequent months, and thus would serve to reduce any

28   future Plan Incentive Pay, although MLOs always received their base pay and were never required

to pay any amount back to PNC at the end of their employment.  *See* Smiles MSJ Decl. ¶ 5.

Deficits sometimes were not carried over between months, including in the first few months of an

MLO's employment and in certain other circumstances defined in the compensation plans.  Smiles

Class Cert. Decl. (dkt. 76-26) ¶ 13.

The difficulty of fitting PNC's compensation plan into the framework of the California

precedent discussed above arises from tension between *Oman* and *Vaquero*.  *Oman* sets forth a

relatively simple test:

> For all hours worked, employees are entitled to the greater of the
> (1) amount guaranteed by contract for the specified task or period, or
> (2) the amount guaranteed by the minimum wage. Whether a
> particular compensation scheme complies with these obligations may
> be thought of as involving two separate inquiries. First, for each task
> or period covered by the contract, is the employee paid at or above
> the minimum wage? Second, are there other tasks or periods not
> covered by the contract, but within the definition of hours worked, for
> which at least the minimum wage should have been paid?

*Oman*, 9 Cal. 5th at 782.

PNC's compensation plan could be said to pass that test, in that PNC always provided a

base level of pay that included compensation for rest breaks, and the only deductions to incentive

pay were consistent with the MLOs' contracts.  But the compensation plan in *Vaquero*, which

*Oman* endorsed as among the consensus of cases with which it agreed, *see id.* at 781, could be said

to pass that test in the same manner: the sales representatives in that case always received at least

$12.01 per hour (including for rest breaks), which is more than the minimum wage, and they

received what their contract provided, because the contract only called for them to receive more

than that hourly rate—in the form of commissions—when their commissions exceeded any deficit

that had previously been compensated by the hourly wage floor.  *Vaquero*, 9 Cal. App. 5th at 103.

There is no indication that the employees could ever end up owing their employer money at the

conclusion of their employment for failure to make sufficient sales—to the contrary, the plan

provided that "an employee will always receive at least $12.01 per hour for every hour worked."

*Id.*  The *Vaquero* court nevertheless concluded that the compensation plan was impermissible

because it treated wages paid (including for rest breaks) when an employee failed to earn

sufficient commissions as a draw against any future commissions.

This Court declines to read *Oman* as overruling *Vaquero* as to two issues *Oman* was not faced with: claims for failure to compensate rest breaks, and a compensation plan that treated wages paid as a deficit incurred against current or future commissions.  As *Vaquero* noted, rest breaks are "sacrosanct" under California law, an "unwaivable" component of the state's "remedial worker protection framework," which must be guarded against compensation plans that would "undermine this protective policy by discouraging employees from taking rest breaks." *Vaquero*, 9 Cal. App. 5th at 113.  And offsetting past payments against future incentive compensation implicates Labor Code section 221 (prohibiting "any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee") and Wage Order 4 (providing at section 12(A) for "no deduction from wages" for rest breaks) in ways not at issue for the rotation-based compensation plan in *Oman*.  The Court therefore accepts *Vaquero* as an accurate statement of California law at least with respect to rest break compensation.  *See Owen ex rel. Owen v. United States*, 713 F.2d 1461, 1464 (9th Cir. 1983) ("In the absence of a pronouncement by the highest court of a state, the federal courts must follow the decision of the intermediate appellate courts of the state unless there is convincing evidence that the highest court of the state would decide differently." (citation omitted)); *Oman*, 9 Cal. 5th at 781 (citing *Vaquero* with approval).

PNC primarily distinguishes *Vaquero* and similar authority—in particular, *Wells Fargo*— on three grounds.  First, in PNC's view (but disputed by Plaintiffs),  PNC paid its MLOs a salary rather than hourly wages.  Second, rather than labeling regular pay an advance or draw on commissions,[10] representing that MLOs "earned" a particular "commission" that might then be reduced, or treating regular pay as an alternative "floor" to be paid *only* when an MLO failed to meet incentive thresholds, PNC always paid its MLOs their regular pay and incorporated that amount as part of the formula it used to calculate Plan Incentive Pay *before* determining whether MLOs "earned" any such compensation.  Third, PNC notes that it paid other forms of incentive compensation separately from Plan Incentive Pay, which were not deducted from Plan Incentive

[10] As Plaintiffs note, there is some evidence of PNC labeling MLOs' regular pay as a "draw," albeit only in limited circumstances that PNC's witnesses assert were mistaken or misleading.

20

United States District Court
Northern District of California

Pay.  *See* Def.'s Opp'n at 10–11.[11]

### 1.  Order of Calculation

Turning to the order of PNC's calculation, the Court concludes that this formal difference from the pay structure in *Vaquero* does not warrant a different outcome.  In *Vaquero*, employees were paid in one of two ways: they generally received only commissions, but if their commissions averaged over a pay period did not exceed $12.01 per hour of work, they instead received pay at that rate, with difference carried forward to offset any future commissions.  Here, PNC always provided regular pay, and incorporated the offset for that pay (including any deficits to Plan Incentive Pay from previous months) within the incentive calculation before determining how much, if any, Plan Incentive Pay an MLO would receive.  The effect is the same.  In either case, an employee who eventually earned incentive pay would receive the same total compensation through that point regardless of whether they had been previously been compensated for any rest breaks at the time they took them.  PNC's witness under Rule 30(b)(6), Michael Smiles, testified as such with respect to pay within a given month where an MLO earned Plan Incentive Pay, Swidler Decl. Ex. 1-R (Smiles Dep.) at 147:19–148:2,[12] and with the exception of limited circumstances where deficits were forgiven, PNC's deficit carryover policy resulted in the same effect where an MLO failed to earn Plan Incentive Pay in one month but earned it in a later month.

Just as in *Vaquero*, PNC MLOs effectively received no additional payment for their rest breaks.  And just as in *Vaquero*, that failure to "compensate employees directly for rest periods undermine[s the state's] protective policy by discouraging employees from taking rest breaks."

---

[11] PNC lists a total of eight reasons to depart from the outcome in *Wells Fargo*, Def.'s Opp'n at 9–12, several of which (items two through five) this order subsumes within the three broad categories set forth above that warrant detailed discussion.  To briefly address the remaining contentions, using PNC's numbering: (1) while *Wells Fargo* involved stipulated facts and this case does not, the Court resolves this issue viewing the disputed facts in the light most favorable to PNC; (6) the special case of MLOs who never qualified for Plan Incentive Pay is addressed separately below; (7) PNC cites declarations from two MLOs who believe they were paid for all time worked and for rest breaks, but individual employees' perceptions of this issue—which turns in part on questions of law—are not dispositive, and entitlement to pay for rest breaks is not waivable; and (8) as discussed above, the Court rejects PNC's view that *Oman* limits the holding of *Vaquero* with respect to pay for rest breaks that is later recaptured.

[12] "Q. So the net effect of PNC paying for rest periods if the employee is beyond the threshold is there is no change in what the employee earns at the end of the month, correct? . . . A. Their total at the end of the month would be no different."

*Vaquero*, 9 Cal. App. 5th at 113.  The different method of calculation that PNC used here does nothing to support the "the remedial worker protection framework" established by California's Labor Code and wage orders.  *See id.* (citation and internal quotation marks omitted).  To the contrary, its compensation plan is equivalent to "simply . . . inserting . . . a minimum wage floor," as Justice Liu's *Oman* concurrence warns would undermine the purposes of the Labor Code and wage orders, and as *Vaquero* and *Gonzalez* held was insufficient to comply with those authorities. *See Oman*, 9 Cal. 5th at 791–92 (Liu, J., concurring) (discussing *Vaquero* and *Gonzalez*).  The California Supreme Court has held that rest break provisions of IWC wage orders "must be interpreted in the manner that best effectuates [their] protective intent."  *Brinker Rest. Corp. v. Superior Court,* 53 Cal. 4th 1004, 1027 (2012); *see Vaquero*, 9 Cal. App. 5th at 113.  Allowing the form-over-substance distinction between the compensation plans here and in *Vaquero* to excuse PNC's effective failure to compensate rest breaks separately from incentive payments would not further that intent.

PNC cites two cases as supporting its view that the order of calculations is determinative. *See* Def.'s Opp'n at 11.  In *Prachasaisoradej v. Ralphs Grocery Co.*, 42 Cal. 4th 217 (2007), the California Supreme Court held that the defendant grocery store's profit-sharing plan did not violate statutes and regulations prohibiting collecting any part of an employee's wages or deducting wages for expenses not caused by an employee's misconduct merely because wages and other expenses were factors that determined whether the store made a profit that could be shared. The court distinguished cases where an "employee's compensation, whether regular or supplementary, was set, in essence, as a sales commission, i.e., a specified and promised share of the revenues attributable to that employee's personal sales or managerial efforts," but "was then directly reduced by the full dollar value of merchandise and cash losses, as determined by the employer, and regardless of employee fault," in violation of California law.  42 Cal. 4th at 236 (citing, *e.g.*, *Kerr's Catering Serv. v. Dep't of Indus. Relations*, 57 Cal. 2d 319 (1962); *Quillian v. Lion Oil Co.*, 96 Cal. App. 3d 156 (1979)).  The court concluded that the profit-sharing plan at issue did not resemble those impermissible pay structures, and instead served "to promote and reward employee teamwork that produced a net profit for the store as a whole," which was

22

"beneficial to both employer and employees." *Id.* at 237.  In the California Supreme Court's view, it "would defy reason and common sense" to hold that the profit-sharing plan "contravenes the wage-protection policies of the Labor Code." *Id.*

This case does not resemble *Prachasaisoradej*.  It is instead more like the earlier cases that *Prachasaisoradej* distinguished—particularly *Quillian*, where, like here, the employer unsuccessfully defended its plan on the basis that it included the challenged deductions in its formula for calculating what incentive pay was due beyond a base wage, rather than applying deductions against amounts already "earned."  *See Prachasaisoradej*, 4 Cal. 4th at 232–33; *Quillian*, 96 Cal. App. 3d at 161.  MLOs' regular pay for rest breaks was set off, dollar for dollar, against any Plan Incentive Pay they might otherwise earn, which (like a commission) otherwise consisted, at least in large part, of a specific "share of the revenues attributable to that employee's personal sales or managerial efforts."  *Cf. Prachasaisoradej*, 4 Cal. 4th at 236.  *Prachasaisoradej* did not address rest breaks or the sort of direct recapture of pay at issue here, and its analysis rooted in the policies underlying the Labor Code tends to weigh against blessing a plan indistinguishable in effect from one the *Vaquero* court determined would undermine those policies.

The other case that PNC cites on this point involved Bank of America loan officers challenging their employer's policy of holding loan officers partially responsible for certain "underages" when loans were issued with lower-than-published interest rates.  *Marr v. Bank of Am.* ("*Marr I*"), No. C 09-05978 WHA, 2011 WL 845914, at *3 (N.D. Cal. Mar. 8, 2011), *aff'd* ("*Marr II*"), 506 F. App'x 661 (9th Cir. 2013).  Judge Alsup cited *Prachasaisoradej* for recognizing a "distinction made was between a plan that provides a wage, makes deductions, and then provides a reduced wage, and a plan that does not provide a wage amount until costs are taken into account," and approving the latter.  *Id.* at *4.  *Marr* did not involve claims based on rest break—compensation for which *Vaquero* held cannot be paid through commissions alone.  *See Vaquero*, 9 Cal. App. 5th at 117 (holding "that such compensation plans must separately account and pay for rest periods to comply with California law").   The Ninth Circuit affirmed summary judgment for the defendant in *Marr* on grounds unrelated to *Prachasaisoradej*, citing a separate

line of California cases allowing deductions from commissions "when (1) the deductions are tied to the employee's sales rather than general business expenses, and (2) the employee agrees to the deductions by contract," and noting only that *Prachasaisoradej* "did not alter this framework." *Marr II*, 506 F. App'x at 661 (citing, *e.g.*, *Koehl v. Verio, Inc.*, 142 Cal. App. 4th 1313 (2006)). PNC has not argued that its MLOs' compensation for rest breaks fall within that doctrine as an expense "tied to the employee's sales." *See id.*; *cf. Vaquero*, 9 Cal. App. 5th at 111 ("Indeed, the purpose of a rest period is to rest, not to work."). *Marr* therefore does not inform the resolution of this case.

In a similar argument, PNC contends that the California Supreme Court's decision in *Schachter v. Citigroup, Inc.*, 47 Cal. 4th 610 (2009), supports its position that employers have wide latitude to structure incentive compensation. Def.'s Opp'n at 18. *Schachter* involved an employee who elected to receive restricted stock—which would vest only after two years of employment—in lieu of a portion of his regular cash compensation, but voluntarily resigned from his job before the stock vested, resulting in the forfeiture of his restricted shares. 47 Cal. 4th at 614–15. The court rejected the plaintiff's contention that upon his resignation and the forfeiture of his stock, his employer should have paid him the cash that he had given up when he elected to receive the restricted stock. *Id.* at 621. Instead, the court held that the vesting schedule for the stock, requiring continued employment over two years, was a valid condition precedent for receiving incentive compensation in the form of fully vested and transferable stock. *Id.* at 621–22. *Schachter* did not address rest breaks, or a policy that directly applied pay intended to compensate for rest breaks as a deduction against future incentive compensation, and thus does not alter this Court's conclusion that *Vaquero* controls.

### 2. Salary Versus Hourly Wage

With respect to payment as a salary rather than hourly wages, PNC highlights a footnote of *Vaquero* declining to reach the question of whether a salary pay structure would alter its analysis, which PNC asserts serves as "guidance" that "the payment of salary satisfies an employer's obligation to pay for rest breaks." Def.'s Opp'n at 11. The footnote in question reads as follows: "This case does not involve, and we have no occasion to question, the propriety of compensation

United States District Court
Northern District of California

plans that pay non-exempt employees a salary that compensates them for rest periods and other nonproductive work time." *Vaquero*, 9 Cal. App. 5th at 110 n.8.  Non-occasion to reach a question is not guidance as to its answer.  Lest there be any confusion as to the *Vaquero* court's intent in declining to address the issue, a separate footnote of the same opinion admonishes defense counsel in that case for characterizing the earlier *Gonzalez* decision as having "'expressly refused to extend' *Armenta* and *Bluford* (which was actually decided after *Gonzalez*) to commission pay plans," when *Gonzalez* in fact only declined to consider the issue on appeal because it was not addressed by the trial court.  *Id.* at 111 n.1.  In the words of *Vaquero*, "*Gonzalez* does not hold or say any such thing."  *Id.*  The same is true here—*Vaquero* does not address whether a salary must separately compensate for rest periods.

More importantly, there is no indication that the footnote in *Vaquero* contemplated a salary *coupled with* a commission-like incentive plan that deducts the value of the salary from any future incentive payments, as opposed to merely the question of whether a salary on its own must account for rest periods separately from productive time.  PNC has not explained why the distinction between a salary and an hourly wage would be meaningful in this context.  Accepting PNC's view that it paid MLOs a salary rather than an hourly wage, some portion of that salary compensated the employees for their rest breaks.  But just like the hourly wage for rest breaks in *Vaquero*, that compensation was effectively recaptured when it served as an offset to future incentive payments.  While this Court is not aware of any California decision specifically addressing a salary that offsets future incentive compensation, California courts have, thus far, found the particular *form* of pay less important than the no-borrowing principle and the protection of rest break compensation.  *See Oman*, 9 Cal. 5th at 781 (noting that "decisions have extended the no-borrowing rule to employees under a collective bargaining agreement [*Bluford*] and an ordinary contract [*Gonzalez*], and without regard to whether the basis for compensation is hourly [citation omitted], by piece rate [*Bluford*; *Gonzalez*], or by commission [*Vaquero*]").

### 3.  Other Forms of Incentive Payment

PNC also contends that its non-Plan incentive payments, such as onboarding bonuses and discretionary bonuses issued by local management, satisfy its obligation to pay for rest breaks.

United States District Court
Northern District of California

*See* Def.'s Opp'n at 9.  The Court disagrees.  PNC represented the bonuses as for purposes other than compensating rest breaks or hours worked, and distinguished them from MLOs' "salaries." There is no evidence that any party understood these particular incentives as pay for rest breaks. Under a straightforward application of *Armenta* and its progeny, PNC cannot "borrow" those payments to satisfy its rest break or minimum wage obligations without breaching the terms on which it made the payments.  The bonus payments do not resemble the rotation payments in *Oman*, which Delta presented and all parties understood as compensation for work performed, nor are they comparable to the sort of "contractual compensation . . . done by task, work period, or other reasonable basis"—all of which would reasonably be understood as pay for work performed—that the *Oman* court held could be averaged to determine whether an employer met minimum wage obligations (without addressing rest breaks).  *Cf. Oman*, 9 Cal. 5th at 782; Def.'s Opp'n at 12 n.12.

\* \* \*

The Court therefore concludes that PNC's compensation plan violated California law by impermissibly deducting the portion of MLOs' regular pay attributable to rest breaks in calculating Plan Incentive Pay.[13]

This is true even where MLOs never received Plan Incentive Pay, because the deficits they accrued as a result of their rest breaks reduced their ability to earn Plan Incentive Pay to which they could have been entitled in the future but for the impermissible compensation structure, rendering the payment insufficiently definite to comply with California law.  So long as an MLO was eligible to earn Plan Incentive Pay, any pay for a rest break was at risk of effectively being subsumed within the incentive payment for a large loan the MLO might issue later the same day, undermining California's worker protection policies by reducing employees' incentive to take rest breaks as recognized in *Vaquero*—even if the deficit created by the salary paid for that break also *might* be forgiven in some future period if the MLO failed to sell enough loans to earn Plan

---

[13] Both parties' arguments have primarily addressed the rest break claims that the Court certified for class treatment.  It is not clear whether Scheid still intends to pursue claims for other nonproductive time on an individual basis or under PAGA, which were not disposed of by the class certification orders.  This order does not address whether such claims are viable after *Oman*.

Incentive Pay before then.  The rest breaks therefore were not provided "in accordance with state law," entitling the MLOs to recovery under section 227(c) equal to one hour of pay per workday. *See Sanchez*, 54 Cal. App. 5th at 545 (affirming damages based on the one-hour penalty when an employer failed to pay his workers for rest breaks separately from their piece-rate compensation).[14]

Plaintiffs are entitled to summary adjudication of this issue.

**D.    Effect of Settlements**

As a general rule, "'[r]es judicata, also known as claim preclusion, bars litigation in a subsequent action of any claims that were raised or could have been raised in the prior action' . . . whenever there is '(1) an identity of claims, (2) a final judgment on the merits, and (3) identity or privity between parties.'" *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001) (quoting *Western Radio Servs. Co. v. Glickman*, 123 F.3d 1189, 1192 (9th Cir. 1997)). "However, the claim preclusion 'inquiry is modified in cases where the earlier action was dismissed in accordance with a release or other settlement agreement.'" *Wojciechowski v. Kohlberg Ventures, LLC*, 923 F.3d 685, 689 (9th Cir. 2019).  Courts then "look to the intent of the settling parties to determine the preclusive effect of a dismissal with prejudice entered in accordance with a settlement agreement, rather than to general principles of claim preclusion," and apply the terms of the release included in the settlement agreement.  *Id.*

The power to release claims in a class settlement is limited to claims "'based on the identical factual predicate as that underlying the claims in the settled class action.'" *Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010) (quoting *Williams v. Boeing Co.*, 517 F.3d 1120, 1133 (9th Cir. 2008); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1288 (9th Cir. 1992)). Courts have generally interpreted that requirement to coincide with the general res judicata test of whether claims share a "common nucleus of operative fact."  *See Class Plaintiffs*, 955 F.2d at 1288 (affirming approval of a settlement including a release where the claims in the two cases at

---

[14] Because failure to compensate rest breaks in accordance with state law can support section 226.7's one-hour premiums under *Sanchez*, Plaintiffs' claim for such relief falls within the class definition of "'claims based on alleged failure to pay for rest breaks, and claims derivative of such a theory.'"  *Cf.* Def.'s Reply at 9 (quoting 1st Class Cert. Order at 16).

United States District Court
Northern District of California

issue "arise from the same common nucleus of operative fact"); *Belew v. Brink's, Inc.*, 721 F. App'x 734, 735 (9th Cir. 2018) (citing *Class Plaintiffs* to apply the "common nucleus" test to evaluate a release in a class settlement); 6 Newberg on Class Actions § 18:19 (5th ed.) ("In giving meaning to what constitutes an 'identical factual predicate,' courts have generally fallen back on the broad conclusion that the test requires only 'a common nucleus of operative fact,' and hence have equated the test with the normal transactional test underlying the scope of claim preclusion itself." (footnotes omitted)); *cf., e.g.*, *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 140 S. Ct. 1589, 1595 (2020) (explaining that the general test for res judicata turns on the "common nucleus" standard). One Ninth Circuit decision held that the "identical factual predicate" standard for a class release is narrower, and better equated to issue preclusion than claim preclusion, but that case conflicts with *Class Plaintiffs*' earlier holding that the "common nucleus" test applies, and it was reversed on other grounds by the Supreme Court. *Epstein v. MCA, Inc.*, 50 F.3d 644, 663 (9th Cir. 1995), *rev'd sub nom. Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367 (1996).

Effectively, a class settlement can choose to reserve issues for future litigation that would otherwise have been precluded by a judgment on the merits, or may extend as broadly as the usual rules of res judicata, but may not release further claims beyond that scope.[15]

### 1. The *Bland* Settlement

On April 11, 2017, the U.S. District Court for the Western District of Pennsylvania entered an order of final approval of the class and collective settlement in *Bland*, including specifically ordering that members of the class were subject to the release in the settlement agreement. Def.'s Request for Judicial Notice re Def.'s MSJ (dkt. 159) Ex. 3. As part of the agreement, each class member released:

---

[15] Both parties' briefs treat this limitation as a due process issue unique to class actions and intended to protect the interests of absent class members from inadequate representation, relying on *Hesse*'s analysis of challenges both to the scope of the release at issue and to the adequacy of plaintiffs in the earlier case to represent the plaintiffs in the case at hand. *See Hesse*, 598 F.3d at 588–92. *Hesse* did not hold that the "identical factual predicate" test derives from concerns about inadequate representation, and the earlier Ninth Circuit cases on which it relies treated the issue instead as concerning the scope of a court's power to enter judgment—much like res judicata. *See, e.g.*, *Class Plaintiffs*, 995 F.2d at 1287–88.

1

2

3

4

5

6

7

8

> any claim he or she has or may have from the beginning time through January 4, 2017, against [PNC], as asserted in this case or that could have been so asserted in this case, under the FLSA or state wage and hour or common law, based on the allegations in the complaint, that accrued while the Eligible Settlement Class Member worked for PNC as an [sic] Mortgage Loan Office, including any claims for non-payment of or improper payment of overtime compensation under any federal, state, or local law or regulation or common law, including but not limited to claims under the federal Fair Labor Standards Act and the wage and hour laws in the [sic] Pennsylvania, New Jersey, Ohio, California, Maryland, Kentucky, Missouri, Illinois, Indiana, Washington, New Jersey, and/or New York and all other state and local wage and hour laws, relating to employment at PNC as a Mortgage Loan Officer. This includes claims for liquidated damages, attorneys' fees, costs, and expenses.

9

*Id.* Ex. 2 ("*Bland* Settlement") ¶ 4.1.

10    The plaintiffs in *Bland*, represented by some of the same attorneys as in this case, brought

11    claims for failure to pay minimum wage and overtime as required by the federal Fair Labor

12    Standards Act and the laws of various states, *see id.* Ex. 1 ("*Bland* Compl.") ¶¶ 193–99, 228–40,

13    breach of contract, *id.* ¶¶ 200–05, unjust enrichment, *id.* ¶¶ 206–14, and violation of other state

14    laws—only identified generally, but including the California Labor Code and California wage

15    orders—by deducting regular pay from incentive pay, *id.* ¶¶ 215–27.  The complaint in that case

16    alleged that PNC purported to pay MLOs a salary based on a forty-hour work week, as well as an

17    additional amount calculated by basis points on loans sold during a limited initial period of

18    employment, and then deducted MLOs' salary (plus the non-premium portion of overtime pay)

19    from incentive compensation in a manner similar to PNC's conduct at issue here.  *Id.* ¶¶ 93, 95–

20    96, 104–05, 117–21.

21    Plaintiffs do not dispute that the *Bland* complaint describes the same compensation plan at

22    issue here, but argue that it does not encompass their claims because it did not specifically address

23    rest breaks or other nonproductive time.  The Court nevertheless concludes that Plaintiffs' claim

24    for failure to compensate rest breaks falls within the release.  The *Bland* complaint included

25    comprehensive allegation regarding PNC's compensation of MLOs, including their base pay

26    annualized to compensate a forty-hour work week, and the Plan Incentive Pay which treated that

27    base pay as a deduction in determining whether MLOs would receive additional compensation

28    based on the loans they sold.  *Bland* Compl. ¶¶ 104–21.  There is no dispute that MLOs' rest

United States District Court
Northern District of California

1   breaks fell within the forty hours per week purportedly compensated by their regular pay.  Nor is

2   there any basis to exclude rest breaks from *Bland*'s discussion of working hours more generally—

3   *e.g.*, *id.* ¶¶ 150–51 (asserting failure to pay for "all hours worked" based on deductions of regular

4   pay from incentive pay)—because both California and federal law require that compensable rest

5   breaks be treated as hours worked.  *See* 29 C.F.R. § 785.18 ("Rest periods of short duration . . .

6   must be counted as hours worked."); Wage Order 4 § 12(A) ("Authorized rest period time shall be

7   counted as hours worked . . . .").  Plaintiffs cite a separate provision of Wage Order 4 defining

8   "hours worked" as time subject to an employer's control, which would not encompass rest breaks,

9   *see* Pls.' Opp'n at 9–10 (citing Wage Order 4 § 2(K)), but the specific instruction that rest breaks

10   "shall be counted as hours worked," Wage Order 4 § 12(A), controls over that more general

11   definition.

12         Plaintiffs misleadingly quote the Ninth Circuit's unpublished decision in *Belew* for the

13   proposition that "'claims relating to meal and rest period violations . . . arise from factual

14   predicates different from claims alleging unpaid . . . wages.'"  Pls.' Opp'n at 4 n.2 (quoting *Belew*,

15   721 F. App'x at 735) (ellipses in original).  The first ellipsis in Plaintiffs' quotation omits other

16   claims brought in addition to rest period violations, including minimum wage claims, and the

17   second ellipsis obscures word "overtime."  *See Belew*, 721 F. App'x at 735.  There is no doubt that

18   failure to pay *overtime* wages—for example, by discouraging employees from reporting their

19   overtime, as the *Bland* plaintiffs alleged separately from their recapture theory—relies on a factual

20   predicate distinct from rest period claims.  But a claim for failure to pay wages *at all* due to

21   impermissible recapture from incentive pay, as also asserted in *Bland*, rests on precisely the same

22   factual predicate as Plaintiffs' claim here, because the same wages recaptured in that case

23   purportedly compensated MLOs for their rest breaks.

24         The Court concludes that Plaintiffs' claims for failure to compensate rest periods through

25   January 4, 2017 fall within the *Bland* release as claims that "could have been . . . asserted in [that]

26   case, under . . . state wage and hour or common law, based on the allegations in the complaint,"

27

28

United States District Court
Northern District of California

*Bland* Settlement ¶ 4.1, and arise from identical factual predicate[16] as the claims asserted in that case based on deductions from incentive pay. That Plaintiffs here seek a different remedy[17] under a theory not specifically asserted in *Bland* is immaterial. Such claims are barred for members of the *Bland* class by the release in that case.

Plaintiffs do not dispute that Scheid's individual claims for failure to compensate nonproductive time other than rest breaks through January 4, 2017 are barred by *Bland*. PNC is entitled to summary judgment on that issue as well, for the same reasons as the Class's rest break claims.

The parties have not addressed in detail whether Plaintiffs' wage statement and waiting time claims fall within the *Bland* release. PNC argues briefly that those claims "do not involve separate evidence of violations." Def.'s Reply at 6. Whether that is true for the wage statement claims might be a close question, since those turn on distinct facts regarding the contents of wage statements. The Court need not reach that question for the Class as a whole—as discussed in a separate section below, the wage statement claims asserted in this case are not appropriate for class treatment due to individualized issues raised by the lack of any statutory presumption of harm.[18] As for waiting time penalties, PNC is correct. Any liability for failure to pay compensation owed within a particular time after the conclusion of an employment relationship flows directly from the facts alleged in *Bland* regarding whether such compensation was owed and unpaid to begin with. Plaintiffs' waiting time claims arise from a common nucleus of fact as the allegations in *Bland* and could have been asserted based on those allegations. To the extent they are based on failure to compensate rest breaks through January 4, 2017, waiting time claims under

---

[16] Although, as discussed above, the "identical factual predicate" standard is best interpreted as coextensive with the "common nucleus" standard for res judicata, the Court would reach the same conclusion under the narrower standard advanced by Plaintiffs.

[17] The holding of *Sanchez*, that employees may recover either wages or one-hour premiums (but not both) for inadequately compensated rest breaks, 54 Cal. App. 5th at 546–47, reinforces this conclusion, because MLOs who were members of the *Bland* class already received compensation through that settlement on the theory that they were not paid for the forty hours per week their base pay purportedly covered, which included the time they spent on rest breaks. That said, *Sanchez* is not necessary to hold that the *Bland* release encompasses Plaintiffs' claims.

[18] Due to the parties' failure to address this issue in any detail in their briefs, the Court declines at this time to resolve whether Scheid's individual wage statement claims are precluded by *Bland*.

section 203 of the Labor Code therefore fall within the scope of the release for members of the *Bland* class.

### 2.  The *Batta* Settlement

By its terms, the class release in *Batta* encompassed only claims for failure to reimburse or indemnify business expenses.  Swidler Decl. (dkt. 161-2) Ex. 1-W ("*Batta* Settlement") ¶ 38.  PNC does not address *Batta* in its briefs.  Plaintiffs are entitled to summary adjudication that *Batta* does not bar any claims in this case for MLOs who were absent members of that class action.[19]

### 3.  Individual Settlements

PNC moves for summary judgment as to the claims of Class members Ming Lo and Taylor Lancaster on the grounds that each executed a broad release as part of an individual settlement.  *See* Groh Decl. Exs. 2, 3 (individual settlement agreements, filed under seal).  The parties dispute whether Labor Code section 206.5 and related California authority limits the enforceability of those releases.  Whatever the merits of that dispute, it presents individualized issues not common to other members of the class, or to the only named plaintiff in this case, Linda Scheid.  Class counsel does not represent Lo or Lancaster individually, and is not in a strong position to raise potential arguments against enforcing their individual releases.

In granting class certification, the Court noted that any issues raised by individual settlements might be resolved by "modifying the class definition . . . at a later date."  1st Class Cert. Order at 11; *see also Armstrong v. Davis*, 275 F.3d 849, 872 n.28 (9th Cir. 2001) (recognizing district courts' "broad discretion to determine whether a class should be certified, and to revisit that certification throughout the legal proceedings before the court," including the authority to "redefine the class"), *abrogated on other grounds as recognized by B.K. ex rel. Tinsley v. Snyder*, 922 F.3d 957, 974 (9th Cir. 2019).  The Court therefore modifies the definition of the Class to exclude Lancaster and Lo, reserving any issues of the enforceability of their releases for individual litigation if either or both of them choose to pursue such arguments in a

---

[19] The release for the named plaintiff in that case, Nasrat Batta, was significantly broader.  *Batta* Settlement ¶ 37.  The parties' briefs do not address whether Batta is a member of the Class here.  If so, the Court would consider excluding Batta from the Class on a subsequent motion or stipulation, for the same reasons discussed below with respect to Ming Lo and Taylor Lancaster.

separate action.

### E.    Wage Statements and *Maldonado*

Section 226(a) of the Labor Code requires employers to provide written wage statements either semimonthly or at the time of each payment including the following information:

> (1) gross wages earned,
>
> (2) total hours worked by the employee, [subject to exceptions for exempt employees not applicable here],
>
> (3) the number of piece-rate units earned and any applicable piece rate if the employee is paid on a piece-rate basis,
>
> (4) all deductions, provided that all deductions made on written orders of the employee may be aggregated and shown as one item,
>
> (5) net wages earned,
>
> (6) the inclusive dates of the period for which the employee is paid,
>
> (7) the name of the employee and only the last four digits of his or her social security number or an employee identification number other than a social security number,
>
> (8) the name and address of the legal entity that is the employer and [additional information for farm labor contractors not applicable here], and
>
> (9) all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee and [certain requirements for temporary services employers not applicable here].

Cal. Lab. Code § 226(a) (line breaks added).

"An employee suffering injury as a result of a knowing and intentional failure by an employer to comply with" those requirements may recover either actual or statutory damages. *Id.* § 226(e)(1).  "[I]naccurate wage statements alone do not justify penalties; the plaintiffs must establish injury flowing from the inaccuracy." *Maldonado v. Epsilon Plastics, Inc.*, 22 Cal. App. 5th 1308, 1334 (2018).  Injury is presumed for certain omissions:

> An employee is deemed to suffer injury for purposes of this subdivision if the employer fails to provide accurate and complete information as required by any one or more of items (1) to (9), inclusive, of subdivision (a) and the employee cannot promptly and easily determine from the wage statement alone one or more of the following:

1

> (i) The amount of the gross wages or net wages paid to the employee during the pay period or any of the other information required to be provided on the itemized wage statement pursuant to items (2) to (4), inclusive, (6), and (9) of subdivision (a).

2

3

> (ii) Which deductions the employer made from gross wages to determine the net wages paid to the employee during the pay period. . . . .

4

5

Cal. Lab. Code § 226(e)(2).

6      In *Maldonado*, an employer had used an invalid alternative workweek schedule to

7   calculate overtime, resulting in failure to pay overtime premiums due for certain hours of work,

8   and the trial court entered judgment in the plaintiff employees' favor on a number of theories,

9   including penalties for inaccurate wage statements under section 226.  *Maldonado*, 22 Cal. App.

10   5th at 1312.  The plaintiffs argued that the wage statements failed to reflect the number of hours

11   worked at each hourly rate, as required by item (9) in subsection (a) of that statute, which creates a

12   presumption of injury under subsection (e)(2).  *Id.* at 1335–36.  The appellate court reversed,

13   holding that the wage statements accurately reflected the hourly rates at which employees were in

14   fact paid.  *Id.* at 1336–37.  The failure to reflect overtime wages that employees *should* have been

15   paid (but were not) instead implicated items (1) and (5) of subsection (a), requiring statements of

16   gross and net wages "earned"—still a violation of the statute, but not included in the narrower list

17   of violations that support a presumption of injury under subsection (e)(2).  *Id.*  PNC argues that

18   *Maldonado* bars Plaintiffs' wage statement claims here because its wage statements "accurately

19   reflected the pay MLOs received from PNC."  Def.'s Mot. at 19.

20      Plaintiffs argue that "permitting without consequence an employer to conceal the number

21   of premium hours" undermines the purpose of section 226.  Pls.' Opp'n at 17.  To the extent

22   Plaintiffs ask this Court to simply disregard *Maldonado*, the Court declines to do so.  The Court

23   must follow *Maldonado* in the absence of compelling evidence that the California Supreme Court

24   would decide the issue differently.  *See Owen*, 713 F.2d at 1464.  Plaintiffs do not claim to have

25   met that standard here, and they have not.

26      Plaintiffs' theory of what information their wage statements omitted is not entirely clear

27   from their opposition brief.  *See* Pls.' Opp'n at 16–18.  Their complaint asserts that PNC's wage

28   statements "have been inaccurate, including because they have not accurately identified missed

34

United States District Court
Northern District of California

rest periods and premium wages owed at applicable hourly rates." 2d Am. Compl. ¶ 34. In their

opposition brief, Plaintiffs note that "*Maldonado* made clear that a pay statement's understatement

of the number of hours worked triggers the statutory presumption of injury," Pls.' Opp'n at 16, but

the allegations of Plaintiffs' complaint do not assert an undercount of hours—at least in the most

straightforward sense of failing to report accurately the number of hours that MLOs worked.

Plaintiffs also argue that even with respect to earnings, *Maldonado* only denied a presumption of

injury, with injury being a precondition for statutory damages—which would not affect the

viability of a claim for injunctive relief or PAGA penalties.[20] *Id.* As PNC correctly notes in its

reply, however, PNC has not sought summary judgment with respect to Plaintiffs' PAGA claim,

and any injunctive relief would be moot in light of PNC having changed its compensation plan in

2019.[21] Def.'s Reply at 12.

Finally, Plaintiffs argue that "beyond understating hours, this case also involves

affirmative misrepresentations of the wage rates" because payment subject to recapture is merely

an advance, and "the pay statements that PNC issued described payments as wages and ascribe

rates other than zero." Pls.' Opp'n at 17. The case on which Plaintiffs rely for that argument

addressed whether a compensation plan based on commissions, but with a minimum amount paid

per pay period and treated as an advance against future commissions, was a "salary" for the

purpose of determining exemption from overtime requirements—an issue not implicated in this

case. *See generally Semprini v. Wedbush Secs., Inc.*, 57 Cal. App. 5th 246 (2020). In the absence

of authority more clearly on point, the Court is not persuaded that section 226 required PNC to list

a wage of zero merely because MLOs' regular pay could have been deducted from future

---

[20] In a footnote, Plaintiffs also argue that *Maldonado* is not applicable to Scheid's individual claim for wage statement penalties based on nonproductive time other than rest breaks. Pls.' Opp'n at 16 n.6. PNC does not address that issue specifically in its reply. The principle of *Maldonado*— that wage statements accurately reflecting hours worked and pay issued, but not pay "earned," do not support a presumption of injury—would not seem to depend on whether the compensation at issue is for rest breaks or other nonproductive time. Even if *Maldonado* precludes a *presumption* of injury for Scheid's individual claim, however, PNC has not moved for summary judgment on whether Scheid could show injury through other means, and the Court declines to reach this individual claim not meaningfully addressed by either party's briefs.

[21] Scheid, the only remaining named plaintiff in this case, concluded her employment with PNC before it modified the compensation plan in 2019. She therefore lacks standing to challenge the PNC's post-2019 compensation plan to which she was never subject.

incentive pay. The Court's conclusion above that PNC's pay structure did not accord with rest break compensation requirements under *Vaquero* is not tantamount to holding MLOs' regular pay—which they were entitled to keep and never required to repay to PNC upon termination of employment—entirely valueless.

Neither party's briefs meaningfully address the actual wage statements in the record, which do not list the correct number of hours (other than vacation and holiday hours) that Scheid worked, and instead appear to list in the "Hours" column the difference between a standard eighty-hour two-week pay period and the hours actually worked, without any explanation on the face of the wage statement. *See* Swidler Opp'n Decl. (dkt. 167-1) Ex. 1-A. At the hearing, defense counsel argued that because the wage statements included both an hourly rate of "16.000" and the total amount paid, *see id.*, MLOs could readily determine their hours worked by dividing the total pay by the hourly rate. Given that the wage statements also list a value for "Hours" that is not the number of hours actually worked—*see id.* (showing zero "Hours" of "Regular Pay" when Scheid did not take vacation, or a negative number when she did)—it is not obvious that MLOs could "promptly and easily determine" the number of hours worked from the wage statements alone. But Plaintiffs have not pursued that theory either in their complaint or in their briefs, and it therefore falls outside the scope of the claim asserted in this case.

The claim that Plaintiffs have actually asserted—that PNC failed to compensate rest breaks in a manner consistent with California law—implicates questions of the rates of compensation MLOs "earned," as opposed to what they were actually paid. Under *Maldonado*, any failure of wage statements to reflect premium pay that should have been paid, but was not paid, implicates only the requirements to show wages earned, which do not support a statutory presumption of injury. That lack of a *presumption* of injury does not necessarily render the claim nonviable, but it would require individualized showings of actual harm to each MLO, in a manner unsuitable for class resolution. The Court therefore modifies the class definition to exclude claims based on inadequate wage statements under section 203 of the Labor Code.

### F.    Waiting Time Penalties and *Naranjo*

PNC argues that the California appellate decision *Naranjo v. Spectrum Security Services, Inc.*, 40 Cal. App. 5th 444 (2019), bars Plaintiffs' claims for both wage statement penalties under section 226 of the Labor Code and waiting time penalties under section 203.  Def.'s Mot. at 19–24.

The requirements of section 226 are addressed above, in this order's discussion of *Maldonado*.  Section 203 provides in relevant part that "[i]f an employer willfully fails to pay . . . any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days."  Cal. Lab. Code § 203.

*Naranjo* primarily concerned an employer's failure to pay premiums for on-duty meal periods—a separate requirement of section 226.7 not at issue in this case.[22]  That case held "that section 226.7 actions do not entitle employees to pursue the derivative penalties in sections 203 and 226," because the California labor code defines "'wages' . . . only in terms of 'labor performed by employees,'" and the premiums required by sections 203 and 226 derive from an employer's conduct, not an employee's labor.  40 Cal. App. 5th at 473–74 (quoting Cal. Lab. Code § 200(a)).  The *Naranjo* court acknowledged tension between two California Supreme Court decisions: *Murphy v. Kenneth Cole Productions, Inc.*, 40 Cal. 4th 1094 (2007), which held that premiums owed under section 226.7 for missed meal or rest periods were "wages" rather than "penalties" for the purpose of a statute of limitations, and *Kirby v. Immoos Fire Protection, Inc.*, 53 Cal. 4th 1244 (2012), which held that claims under section 226.7 were not "'action[s] brought for the nonpayment of wages'" for the purpose of an attorneys' fees statute because the wrong addressed by section 226.7 is a noncompliant rest or meal break, which is remedied but not

---

[22] *Naranjo* also held that the trial court erred in declining to certify class treatment for rest break claims.  40 Cal. App. 5th at 476–82.  It did not specifically address the interplay between rest break payments or premiums and sections 203 and 226, but there is no reason to believe its analysis of premiums under section 226.7 would differ depending on whether those premiums were owed for rest breaks or meal breaks.

1    absolved by paying the one-hour premium wage required by that statute, 53 Cal. 4th at 1259

2    (quoting Cal. Lab. Code § 218.5(a) (alteration in original)).  The California Supreme Court has

3    granted review of *Naranjo*, but has not yet decided the case.  455 P.3d 704 (2020).

4           One earlier California appellate decision reached the same conclusion as *Naranjo* with

5    respect to claims under section 203 based on premiums owed under section 226.7, but only as an

6    alternative to its primary holding that an arbitration award denying recovery under section 203 was

7    not subject to review.  *Ling v. P.F. Chang's China Bistro, Inc.*, 245 Cal. App. 4th 1242, 1259–61

8    (2016).  Decisions from this district have construed *Ling*'s holding regarding the interplay

9    between sections 226.7 and 203 as dicta, and declined to follow it.  *Karl v. Zimmer Biomet*

10   *Holdings, Inc.*, No. C 18-04176 WHA, 2018 WL 5809428, at *10–11 (N.D. Cal. Nov. 6, 2018); *In*

11   *re: Autozone, Inc.*, No. 3:10-md-02159-CRB, 2016 WL 4208200, at *7 (N.D. Cal. Aug. 10, 2016).

12          While this Court is generally required to follow decisions of California appellate courts

13   interpreting state law, neither *Naranjo* nor *Ling* have precedential value as to this question.

14   *Naranjo*, although not depublished, is no longer precedent as a result of the pending review by the

15   California Supreme Court.  Cal. R. Ct. 8.1115(e)(1); *Bates v. Leprino Foods Co.*, No. 2:20-CV-

16   00700 AWI BAM, 2020 WL 6392562, at *5 (E.D. Cal. Nov. 2, 2020) (declining to follow

17   *Naranjo* on that basis).  As stated in *Karl* and *Autozone*, *Ling* address the issue only in dicta.

18          There are compelling reasons to believe the California Supreme Court will reverse

19   *Naranjo*, because its holding that premiums under section 226.7 are not "wages" directly conflicts

20   with the California Supreme Court's decision in *Murphy*.  *See e.g.*, *Murphy*, 40 Cal. 4th at 1099

21   ("We conclude that the remedy provided in Labor Code section 226.7 constitutes a wage or

22   premium pay . . . ."); *id.* at 1111 ("'Functional' Analysis Does Not Undermine Conclusion That

23   Payment Constitutes a Wage"); *id.* at 1120 ("We hold that section 226.7's plain language, the

24   administrative and legislative history, and the compensatory purpose of the remedy compel the

25   conclusion that the 'additional hour of pay' is a premium wage, not a penalty.").  With the

26   California Supreme Court having squarely addressed whether premiums under section 226.7 are

27   "wages," neither this Court nor the *Naranjo* court is free to start from first principles (like section

28   200 of the Labor Code) to reconsider that issue.

*Kirby* addresses a separate issue: whether "section 226.7 *claims* . . . constitute '*action[s]*' brought for the nonpayment of wages.'" *Kirby*, 53 Cal. 4th at 1259 (alteration in original; emphasis added). The nature of the *claim* is not relevant here. Section 226 implicates "wages" earned, Cal. Lab. Code § 226(a), and section 203 turns on "wages" unpaid, *id.* § 203(a). Unlike the attorneys' fees statute addressed in *Kirby*, neither statute at issue here turns on the nature of a plaintiff's *action*. While *Naranjo* and *Ling* reached a contrary conclusion, noting section 203(b)'s reference to an "an action for the wages from which the penalties arise," their reasoning is not persuasive. *See Naranjo*, 40 Cal. App. 5th at 469; *Ling*, 245 Cal. App. 4th at 1261. Contrary to those cases' conclusions, subsection (b) does not render a waiting time claim "purely derivative of" an action for wages—it merely sets a statute of limitations that coincides with that for an action for wages:

> Suit may be filed for these penalties at any time before the expiration of the statute of limitations on an action for the wages from which the penalties arise.

Cal. Lab. Code § 203(b). *Naranjo* and *Ling*'s reliance on that provision to entirely bar section 203 claims based on certain types of "wages" places more weight on a subsection plainly intended only to concern the *timing* of an action than it reasonably can bear.

Under *Murphy*, premiums owed under section 226.7 are wages. This Court therefore concludes that the California Supreme Court will reverse *Naranjo*'s holding to the contrary, and declines to grant PNC summary judgment on any claims based on that decision.[23]

## IV.    CONCLUSION

For the reasons discussed above, the Court grants summary adjudication of the following issues: (1) PNC's compensation plan failed to pay MLOs for rest breaks in accordance with California law during the Class period; (2) *Bland* bars claims for premiums under section 226.7 for inadequate rest breaks prior to January 5, 2017, and related claims for waiting time penalties,

---

[23] The Court declines to take judicial notice of the amicus briefs in *Naranjo* that Plaintiffs submitted, and has not considered those briefs in reaching a decision here. PNC is correct that incorporating by reference legal arguments submitted by other parties in other cases would evade the page limits applicable to Plaintiffs' briefs and place PNC at a disadvantage to respond in its reply.

United States District Court
Northern District of California

United States District Court
Northern District of California

for all members of the class in that case, as well as Scheid's individual claims for failure to compensate other nonproductive time before that date; (3) *Batta* does not bar any claims in this action;[24] and (4) Plaintiffs are not entitled to a presumption of injury for any failure of wage statements to include premiums or other pay that should have been provided but was not. The motions for partial summary judgment are otherwise DENIED.

The Class is hereby modified to exclude Ming Lo and Taylor Lancaster based on the non-common issues raised by their individual settlement agreements, and to exclude all wage statement claims based on the individualized issues implicated by the lack of a statutory presumption of injury. Going forward, the Class is therefore defined as all individuals who were employed by PNC as mortgage loan officers from June 28, 2014 through June 29, 2019 except Ming Lo and Taylor Lancaster, and is certified only to pursue claims based on PNC's alleged failure to pay for rest breaks during that time, as well as claims derivative of such a theory, except for claims based on inaccurate wage statements.

The parties shall meet and confer to determine a suitable method of notifying the Class of this revised definition, and shall file a joint statement proposing such a method no later than March 29, 2021.

**IT IS SO ORDERED.**

Dated: March 15, 2020

JOSEPH C. SPERO
Chief Magistrate Judge

---

[24] With the possible exception of claims covered by Nasrat Batta's individual release, an issue this order does not address.